## THE STATE v. O. B. SNOW, Appellant.

### Division Two, March 18, 1922.

1. **MURDER: First Degree: Deliberation.** Where there is no pretense of killing by poison, by lying in wait or in the perpetration of any of the crimes designated by statute, a verdict of guilty of first degree murder can be sustained only by evidence of a wilful, deliberate and premeditated killing.

2. ———: **Second Degree: Intentional Killing with "Deadly Weapon: Presumption.** From an intentional killing of a human being by another, where a deadly weapon is used by him and at a vital part of the body, there arises a presumption of murder in the second degree, absent proof of other facts tending to show deliberation to raise such killing to first degree murder or to show want of premeditation and malice to reduce such killing to manslaughter or to show such killing was excusable or justifiable.

3. ———: **Deliberation: Evidence.** Deliberation as an element of murder in the first degree need not be proved by direct evidence, it may be proved by facts and circumstances sufficiently evincing its existence.

———: ———: ———: **Instructions.** In this case there being no evidence of deliberation, it was error for the trial court to instruct upon murder in the first degree, and inasmuch as defendant was convicted of that offense such error was clearly and necessarily prejudicial.

5. ———: **Deadly Weapon: Poker.** Where the evidence in a prosecution for murder showed that deceased died from a fracture of the skull, just above the left ear, caused by a blow from some blunt instrument, and that defendant admitted that he killed deceased with a poker, and that a poker was found in defendant's house, but there were no marks of blood upon it, nor did it appear that it was the poker referred to in defendant's admission, and the record was entirely silent as to its size or shape and also as to the size or shape of any other poker defendant might have used, it was error to assume that the poker used by defendant was a deadly weapon or that it was intentionally used by defendant as such.

6. ———: ———: **Question for Jury.** Unless under the proof, in a prosecution for murder, there can be no difference of opinion that the instrument of death was of a deadly character or that, as used, it was intentionally used as a deadly weapon by the assailant,

its character, as such deadly weapon, is one for the jury to determine under appropriate instructions.

7. ———: ———: **Intent to Kill: Presumption.** In a prosecution for murder where there was proof that death was caused by a blow from some blunt instrument and that defendant admitted he killed deceased with a poker, the jury would be warranted in finding that the poker was used by defendant in such manner as to be a deadly weapon, without proof of its actual character, and if they found that such poker, as used, was such deadly weapon and was intentionally used by defendant as such at a vital part of the deceased's body, they would be justified in finding defendant intended to kill deceased; and if they so found, then they would be authorized to find defendant guilty of murder in the second degree, under the permissible indulgence of the presumption of intent to kill arising from the intentional use of a deadly weapon at a vital part, absent proof of other facts explaining and characterizing the acts and conduct of defendant.

8. ———: ———: **Manslaughter.** In this case, there being no evidence authorizing an instruction on murder in the first degree, if the jury, under appropriate instructions, did not find that the poker as used was a deadly weapon, then there was no evidence of murder in the second degree, and the jury should have been instructed as to manslaughter under Section 3236, Revised Statutes 1919.

Appeal from Clinton Circuit Court.—*Hon. A. D. Burns,* Judge.

REVERSED AND REMANDED.

*Barney E. Reilley* and *Phil Slatterly* for appellant; *W. G. Lynch* of counsel.

(1) An intent to kill is essential to murder in either degree. State v. Kyles, 153 S. W. 1050; State v. Kinder, 184 Mo. 294; State v. Foster, 61 Mo. 554; State v. Underwood, 57 Mo. 49; State v. McKinzie, 102 Mo. 628; State v. Gassert, 65 Mo. 355, 356, 4 Mo. App. 57; State v. Wieners, 66 Mo. 23. (2) An intent to kill cannot be presumed in the absence of a deadly weapon. State v. Gassert, 4 Mo. App. 57; State v. Harris, 108 S. W. 33. (3) In the absence of a deadly weapon, nothing more appear-

ing than the death, the intent to kill is not shown. State v. Clancy, 125 S. W. 459; State v. Wansong, 195 S. W. 1002. (4) An intent to kill cannot be presumed from the mere fact of killing. Maher v. People, 10 Mich. 212; State v. Porter, 34 Iowa, 131. (5) A deadly weapon is one likely to produce death. State v. Harris, 108 S. W. 33; State v. Bowles, 146 Mo. 13; State v. Belfiglio, 134 S. W. 598. (6) The deadly character of the weapon should have been submitted to the jury. State v. Harris, 108 S. W. 33; State v. Belfiglio, 134 S. W. 598; State v. Clancy, 125 S. W. 459; State v. Stubblefield, 144 S. W. 405. (7) The question of intent is peculiarly within the province of the jury. State v. Miner, 92 S. W. 468, 469; 21. Cyc. 1027, 1036, 1039; State v. Stewart, 49 Mo. 420. (8) There was no malice shown in this case. State v. Wieners, 66 Mo. 20; State v. Meyers, 121 S. W. 135, 136. (9) There was no express malice. State v. Wieners, 66 Mo. 20; State v. Harris, 108 S. W. 33. (10) In the absence of a deadly weapon, murder cannot be presumed. State v. Harris, 108 S. W. 33. (11) Premeditation is never presumed. State v. Foster, 61 Mo. 554; State v. Garrett, 207 S. W. 784; State v. Kyles, 153 S. W. 1050. (12) Deliberation was not shown. State v. Speyer, 106 S. W. 509; State v. Young, 119 Mo. 524; State v. Silk, 145 Mo. 248; State v. Kyles, 153 Mo. 1050; State v. Liolios, 285 Mo. 1; State v. Frazier, 137 Mo. 340. (13) Unless the evidence discloses deliberation, the jury should not be instructed on murder in the first degree. State v. Kyles, 153 S. W. 1050. (14) The jury cannot determine as to the degree of murder unless evidence of both degrees is placed before them. State v. Kyles, 153 S. W. 1050. (15) The jury should have been instructed on manslaughter. State v. Wilson, 98 Mo. 448; State v. Gassert, 65 Mo. 353, 4 Mo. App. 44; State v. Kinder, 184 Mo. 294; State v. Wieners, 66 Mo. 20; Comm. v. Webster, 5 Cush. (Mass.) 295; 13 R. C. L. 783; 21 Cyc. 760, 762; State v. Berkley, 109 Mo. 674; Sec. 4468, R. S. 1909; Sec. 3326, R. S. 1919; State v. Lockwood, 119 Mo. 463; State v. Hermann, 117 Mo. 635; State v. Elliott, 98 Mo.

156. (16) There was nothing more than a suspicion that the poker exhibited to the jury was used in the killing, and suspicion is not evidence. State v. Tracey, 225 S. W. 1017.

*Jesse W. Barrett,* Attorney-General, and *J. Henry Caruthers,* Special Assistant Attorney-General, for respondent.

The instructions given by the court fully and correctly declared all the law applicable to the evidence in this case and were very favorable to defendant. State v. May, 172 Mo. 638; State v. Howell, 117 Mo. 344; State v. McCarver, 194 Mo. 727, 743.

DAVID E. BLAIR, J.—Defendant, appellant herein, was tried for first degree murder, was convicted of the same, was sentenced on the verdict to life imprisonment in the penitentiary, and has appealed.

On Tuesday, October 26, 1920, one Dick Wamsley, aged about twenty years old, a resident of the city of Cameron, was found dead in a house owned and sometimes occupied by the defendant and located in that city. His skull was fractured just above the left ear from a blow from some blunt instrument, and other wounds were found on the body. His body, fully clothed, was discovered lying on a tarpaulin spread over a blanket upon a bed and springs. Wamsley's Ford automobile was found in the street adjacent to defendant's house. Considerable blood was found on the floor of the rear seat and some of it had flowed down over the running board of the car. There were also blood stains on the front lamps. There was no evidence of any struggle in the house. The presence of a pool of blood on the tarpaulin under deceased's head, some of which had leaked through onto the floor, tended to show that he was still alive when he was placed on the bed.

One George Sweat testified that he was watching defendant's house from about midnight of Friday, October 22nd, in the hope of securing evidence against defendant for the purpose of prosecuting him for selling

liquor, and that about two o'clock in the morning he saw defendant drive up to his house in an automobile and carry some one into the house, and shortly afterwards saw him come out and then heard defendant say, " You son-of-a-bitch, you will not talk now." Deceased's car remained standing in the street from that time until the body was discovered on Tuesday.

The last time deceased was seen alive was late on Friday night, October 22nd. He was then in the company of the defendant. Defendant and the deceased had been friends for some time and were together frequently. No trouble between them is shown to have existed. Defendant, and probably deceased, had been drinking that night. Deceased had been at defendant's house earlier in the evening and drove away after nine o'clock with the defendant and one Wiss. Deceased and defendant were again seen together about ten o'clock by one Coon, who had been previously with them and left them when they started to drive out to the Harris school house, where a box supper was being given. Defendant and some other men in the car arrived there just as the teacher was locking up the school house. She then entered an automobile and rode into Cameron, and the automobile in which defendant was riding with the other men followed. She testified that she thought defendant got out of the automobile in front of the bank in Cameron.

It does not appear necessary to set out the testimony as to defendant's whereabouts at various times during the night. At about 4:45 or 5 o'clock Saturday morning defendant was seen at Cameron Junction, where he boarded a train at 5:15 a. m. for St. Joseph. He had first bought a ticket for Kansas City and later changed it for one to St. Joseph.

One L. B. Snider, an uncle of defendant by marriage, testified that he met defendant in Hamilton on Saturday afternoon, October 23rd, about three or four o'clock. Hamilton is in Caldwell County, east of Clinton, while St. Joseph is west of Clinton. Defendant told Snider he had come from St. Joseph on the morning train. Defend-

ant went home with Snider Saturday night and remained until Tuesday evening, when he and Snider went together to Cameron. Defendant appeared nervous while at Snider's home, and when they neared Cameron he did not want to get off the train, and when asked by Snider for the reason said, "Just the way things were," and that he was afraid they would lock him up. Riding in a taxi-cab towards defendant's house the driver told defendant and Snider of the finding of Wamsley's dead body in defendant's house, and then asked defendant if he still wanted to go on down. Defendant said, "No." They then turned around and went up town to the restaurant. There defendant and Snider procured a newspaper and read an account of Wamsley's death. Defendant then asked Snider to swear that he and his two boys took him out to Cameron on Friday night, as this was the only way he could get out of it. After his arrest defendant was taken to his home and expressed an unwillingness to enter the room where the body was found until he was assured that it had been removed. Snider was later charged as an accomplice of defendant and was placed in a cell in the county jail adjoining the one in which defendant was confined. They were the only prisoners in the jail at the time. They were thereafter taken to the sheriff's office, and during their absence a dictagraph was installed in each of the cells by one O'Leary, a detective, and these instruments were connected by wires leading to two receivers in the court house nearby, where O'Leary and the sheriff, Clarence David, listened to conversations between defendant and Snider during the night after they were returned to their cells. Among other things, they heard defendant tell Snider that he knew he (Snider) had nothing to do with the killing and advised him to bring suit for damages against the officers. Later, they heard defendant tell Snider that he killed deceased with a poker. They also heard defendant tell Snider that he had a knife concealed in his cell which he intended to use on the sheriff. The next day a knife was found in defendant's cell.

Snider was probably used as a decoy, or as such person is sometimes called in the parlance of the under world, a "stool pigeon." At any rate, he testified for the State at the trial and corroborated what O'Leary and Sheriff David testified to having heard over the dictagraph as to defendant killing deceased with a poker. Defendant did not testify as a witness.

We have attempted to state the facts as briefly as possible. No question is raised as to the sufficiency of the evidence to submit the case to a jury as to the criminal responsibility of defendant for the homicide. Appellant contends there is not sufficient proof to entitle the State to instructions on first and second degree murder. Certain other facts will appear in discussing the assignments of error.

I. The general rule is that a presumption of murder in the second degree arises from an intentional killing of a human being by another where a deadly weapon is

Second Degree Murder.

used by him at a vital part of the body, absent proof of other facts tending to show deliberation to raise such killing to first degree murder or to show want of premeditation and malice to reduce the killing to manslaughter or to show that such killing was excusable or justifiable.

In State v. Kyles, 247 Mo. 640, l. c. 647, BLAIR, C., said:

"In this case there is no pretense of killing by poison, by lying in wait or in the perpetration of any of the crimes designated by the statute, and, as a consequence, the verdict cannot be sustained except by evidence of a wilful, deliberate and premeditated killing. The contention is that there is no evidence of deliberation. From an intentional killing with a deadly weapon, nothing more appearing, there arises a presumption that the act constitutes murder in the second degree. The court, in substance, so instructed the jury in this case. It is true that direct evidence of deliberation is not necessary and true that this element may sufficiently appear from facts and

circumstances. It is also true that it must be proved in some way, either by direct evidence or by facts and circumstances which sufficiently evidence its existence. Certain facts are by the statute made sufficient evidence of deliberation, but of none of these is there evidence in this case. There is no evidence of threats, former grudge or preparation. There is no evidence of previous hostility of defendant toward deceased. . . . There is not a circumstance in evidence which tends to prove anything more heinous than an intentional killing with a deadly weapon. This the law presumes to be murder in the second degree when nothing else appears. In order to make it first degree murder it was incumbent upon the State to offer evidence of deliberation.''

The rule so clearly stated above is abundantly supported by authority and applies to the facts shown in the instant case. [State v. Minor, 193 Mo. 597, l. c. 608 and 609; State v. Young, 119 Mo. 495, l. c. 524.]

Assuming for the present that the poker used by defendant was a deadly weapon and that defendant intentionally struck the deceased therewith at a vital part of his body and killed him, this bare admission is not sufficient to prove that the killing was deliberate. The only scrap of evidence which might be said to tend to show deliberation is the remark of defendant as he came out of the door of his house after carrying deceased into said house, to-wit: ''You son-of-a-bitch, you will not talk now.'' The blood in and on the automobile and the absence of any struggle in the house show almost conclusively that the fatal blow must have been struck before deceased was carried into the house. This remark was therefore made sometime after the blow was struck. Such a remark accompanying the delivery of the blow would tend to characterize the act and show the defendant struck in revenge for some previous wrong or in pursuance of a formed design to close the lips of the deceased. The fact that defendant carried deceased to his own house argues that he then had some hope of deceased's recovery and thought death had not yet oc-

curred.  The remark is more consistent with the inflic-
tion of the blow in sudden anger than it is with delibera-
tion, when we consider that the deceased and the de-
fendant had been close friends and no previous trouble
was known to exist between them.  If the blow was in-
flicted deliberately and with a design to cause death, it
would seem the natural thing for defendant to do would
have been to leave the body where the blow was inflicted
or to endeavor to conceal it in some place which would not
point to himself as the murderer.  If defendant struck
deceased in sudden anger and then carried him to his
own house in the hope of reviving him, the remark at-
tributed to him by witness Sweat, taken by itself, is not of
such a character as to overcome the presumption of in-
nocence of the graver crime of murder in the first de-
gree.  Nor is the State's case helped out if we assume
that defendant carried the body to his house solely to
conceal it there or to remove it elsewhere later.  Such re-
mark might be regarded as tending to prove a criminal
intent, but not deliberation in the face of the presumption
of innocence.

Our conclusion is that the evidence of the State
proved nothing more than murder in the second degree,
assuming that the poker was a deadly weapon, and there-
fore that the giving of an instruction on murder in the
first degree, was error.  Since the defendant was con-
victed of murder in that degree, the error was clearly
and necessarily prejudicial.

II.  We have proceeded thus far on the assumption
that the poker with which defendant killed deceased was
a dangerous and deadly weapon.  If such poker was in
fact a deadly weapon and defendant intentional-
ly struck deceased therewith at a vital part, then
the jury had the right from such facts to find

Deadly
Weapon.

that defendant made such assault with the intent to kill.  If
the poker was not in fact a deadly weapon or was not
intentionally used in such manner as to make it a deadly
weapon, then there is no evidence in this case of an in-
tent to kill.

All that is shown is that there was a poker found in defendant's house. Whether or not it is the poker referred to by defendant in his admission to Snider, does not appear. In view of the blood found in and on the automobile and the want of marks of blood on the poker found in the kitchen and the absence of evidence of a struggle in the house, it is exceedingly unlikely that said poker was the one used by defendant. Assuming that it was the poker used, the record is as entirely silent as to its size or shape as it is in regard to the size or shape of any other poker defendant might have used. It is a matter of common knowledge that pokers vary in size and weight from the short and slender rods used as pokers in parlor stoves or the ordinary kitchen stove poker to the long and heavy pokers used about furnaces under powerful steam boilers. It was therefore error to assume that the poker used by defendant was a deadly weapon or that it was intentionally used by defendant as such.

It may be conceded that in the hands of a strong man a short, light poker might be so used as to constitute a deadly weapon. With defendant's admission that he killed deceased with a poker and proof that death was caused by the use of some blunt instrument, the jury would have been warranted in finding that the poker was used by defendant in such manner as to be a deadly weapon, without proof of its actual character, and, if the jury found said poker as used was such deadly weapon and was intentionally used by defendant as such at a vital part of the body of deceased, they would have been justified in finding defendant intended to kill the deceased. [State v. Bowles, 146 Mo. l. c. 13; State v. Harris, 209 Mo. l. c. 438; State v. Miller, 264 Mo. l. c. 403.] If they so found then they would have been authorized to find defendant guilty of murder in the second degree, under the permissible indulgence of the presumption of intent to kill arising from the intentional use of a deadly weapon at a vital part, absent proof of other facts explaining and characterizing the acts and conduct of defendant.

It must be understood that we are here dealing solely with a presumption, and that we do not mean to hold that a conviction of murder in the first or second degree will not be justified in a case where the proof shows the actual intent of the assailant independent of any presumption arising from the intentional use of a deadly weapon at a vital part. In the case before us there is no proof whatever concerning the intent of the defendant, except the proof supplied by the indulgence of the presumption we are here discussing.

Unless, under the proof, there can be no difference of opinion that the instrument of death was of a deadly character or that the instrument as used was intentionally used as a deadly weapon by the assailant, its character as such deadly weapon is one for the jury to determine under appropriate instructions.

III.   The jury should have been instructed on manslaughter.   There was no evidence authorizing an instruction on murder in the first degree, as we have found above.   If the jury, under appropriate instructions, did Manslaughter. not find that the poker as used was a deadly weapon, then there was no evidence of murder in the second degree.   Section 3236, Revised Statutes 1919, provides:

"Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter."   See State v. Gore, 292 Mo. 173, for a discussion of the effect of the 1919 amendment of the statute in relation to manslaughter.

IV.   Complaint is made of the action of the trial court in permitting witness George Sweat to testify after the defendant had put in his evidence and without his name having been indorsed upon the information.   The propriety of such action need not be discussed here, because on a retrial such testimony will doubtless be put in as a part of the State's case in chief.

V.   Other complaints of error in the giving of instructions and admissions of testimony are urged by appellant, but they are of such a character that they will not likely occur on a retrial and this opinion need not be further lengthened in their consideration.

For the errors pointed out, the judgment of the trial court is reversed and the cause remanded.   All concur.