STATE of Missouri, Respondent,

v.

Soloman SEALS, Jr., Appellant.

No. 57978.

Supreme Court of Missouri,
Division No. 2.

Oct. 14, 1974.

Rehearing Denied Nov. 12, 1974.

John C. Danforth, Atty. Gen., Mark D. Mittleman, Asst. Atty. Gen., Jefferson City, for respondent.

Martin A. Rosenberg, St. Louis, for appellant.

HENRY I. EAGER, Special Commissioner.

Defendant was convicted of first degree murder and, pursuant to the jury verdict, he was sentenced to life imprisonment. He was represented at trial by able appointed counsel and was likewise so represented here. We take jurisdiction under our order of April 9, 1973, the notice of appeal having been filed before that date.

The jury might reasonably have found the facts as we now relate them. On the evening of November 3, 1971, at about nine o'clock, Thomas Spencer, Jr. (hereafter described as Spencer) met defendant on the street in front of Spencer's house; defendant asked him if he knew "a boy named Ronald." Spencer said "No" and asked defendant "Why?" Defendant then said that "Ronald who was down at Rosalind's was messing with my sister." We inject here that the sister, Earlene Spencer, had been defendant's girl friend, and was pregnant by him at that time. The two proceeded to Rosalind's house nearby, knocked, and entered. Rosalind Williamson and "two boys" were sitting at the kitchen table, and Rosalind said she "didn't want no trouble." Defendant asked "which one was named Ronald"; one boy stood up and said his name was Ronald. (This was Ronald Lane.) Defendant asked him to step outside and said that he wanted to talk to him. The two, defendant and Ronald, went outside to a small porch and very shortly thereafter Spencer followed them out, closing the door. Ronald was standing by the door and defendant was facing him, perhaps standing on the first step leading from the porch. Spencer heard defendant say to Ronald "that he didn't want him messing with his woman"; Ronald answered that "he wasn't messing with her," and that they just went to school together; defendant said further "make sure that you don't," and "came out of his back pocket and stabbed him." Explaining further, Spencer testified: that defendant brought the knife from his back pocket with his right hand, a long "butterfly" knife with a blade about seven inches long, and struck Ronald with it somewhere in the chest; that he did not see Ronald Lane do anything; that he, Spencer, then grabbed defendant and Ronald turned and went into the house. Ronald entered the house and collapsed; he died before he reached the hospital. Defendant and Spencer left. Spencer had not previously known Lane, but he had known defendant for a considerable time. Spencer demonstrated how the stabbing was done, and testified that he saw the knife strike Ronald in the chest. At about 10:30 that evening defendant appeared at the home of Beverly Glass, his new girl friend, told her that "he had stabbed some boy," that he

threw the knife on a roof, and that she should tell the police that he had been there since four o'clock; he further told her that he stuck the knife in the boy and "twisted it." Beverly testified that she did tell the police that defendant was at her home from 4:30 p. m. until 8:00 the next morning; that she saw the knife on the day before the killing, it being the one "he said he stabbed the boy with." The autopsy showed that there was a stab wound with a 2–3 inch penetration of the left side of the chest and that it entered the right side of the heart. Lane died of that wound.

Defendant testified that he had served time in Algoa for purse snatching; that he was the father of Earlene's baby but that they had broken up about six weeks prior to November 3, 1971, although he still saw her occasionally. Defendant's version of the slaying was, in substance: that he and Spencer went to Rosalind's house, entered, and that he asked "which one of you is Ronald?"; that Ronald stood up, and defendant asked him to step outside; that Ronald went out and defendant followed; that he and Ronald talked; that Ronald commented on his walking out on Earlene; that defendant accused him of meddling, and that Ronald "come off the wall and dropped his hand and I saw the knife and ran into him"; that he grabbed Ronald's hand, down low, pulled it up and "twisted it around," pushed Ronald against the wall and the knife went into him. At another point he testified that "I pushed the knife in and took it out of his hand"; he also testified: that Spencer was somewhere behind him at the time of the stabbing and did not actually see it; that Spencer pulled him away, and Ronald went into the house; that he threw the knife in a trash can; that there were some lies in the letters he wrote; that he had learned of Spencer's statement to the police. Certain of the police officers testified that defendant gave a false name when arrested, that he denied all knowledge of the slaying and said that he was with his girl friend from

4:00 p. m. on November 3 until 8:00 the next morning. This was precisely contrary to his testimony at the trial. Defendant testified that he went to Beverly Glass' after the stabbing. The jury obviously rejected defendant's testimony.

Spencer was charged as an accessory to the slaying; he made a statement to the police in the early morning after the slaying and appeared before the grand jury. For a time he and defendant were confined together or near each other in the jail; later Spencer was moved to another tier. Defendant then wrote several letters to Spencer, all identified and all received by Spencer; he wrote one to another inmate confined near Spencer and one to Earlene. These letters were offered in evidence; after consideration of objections the Court eliminated certain parts, excluded one entirely, and had those parts to be admitted typed as excerpts and renumbered as exhibits. The excerpts cover six pages of the transcript and it would be wholly impractical to relate them in detail. Their essential substance was: that defendant had told his lawyer that Spencer did not see the stabbing and that he should so testify; that Spencer was the last chance he had and that all he had to do was to change his statement and say that it was [D]onald's knife and that he pulled it on me; that he pulled the knife from his back pocket and ran toward me; that we "was scuffling" with the knife and that he had it in his hand when he was stabbed; promise me you will say this; all you have to do is change your story; I am trying to put you away from the scene of the crime; this letter could send me away just as easy as your mouth; please don't let me down Bud; help me man, please; my life is in your hands; I'm gone without your help; I found out that you told on me; if we tell on each other we will both go to the penitentiary and if you tell on me you'd better pray that they give you a probation; without your statement they won't even have a case. In the letter to the other inmate, Robert Elise, defendant stated, in sub-

stance: that he "stabbed a dude and the dude died," and that Thomas was with me; I guess he had told those people I did it; he can still "make paper" if he change (sic) his statement and say I killed the dude accidentally; he is scared; I need him to tell these people that the dude attacked me with the knife; he won't answer me; talk to him for me.

Defendant conceded in his testimony that the references in the letters to "Donald" were meant for Ronald Lane. When the assistant circuit attorney started to read to the jury the excerpts from defendant's letters, he said that he was authorized to read them in the typewritten form prepared and that "portions of this evidence on this sheet and other portions prejudicial to the defendant have been excluded." Counsel for the defendant immediately moved for a mistrial because the statement referred to the excluded portions as "prejudicial." The ensuing colloquy and the court's action will be discussed later.

Defendant's points here are: (1) that the excerpts of defendant's letters were inadmissible as too remote in time, and "if material, then only as to such portions as related to the commission of the crime"; that admissions that defendant would be convicted if Spencer did not change his story and that both would go to the penitentiary were admissions of law and not fact, were only opinions, and did not have the effect of a judicial admission. (2) That the failure of the court to grant a mistrial upon the making of the statement that prejudicial portions of the letters had been excluded was error, and (3) that it was error to give Instruction No. 1 (on first degree murder) because deliberation was not shown.

■ The excerpts from defendant's letters, as read to the jury, were clearly admissible. State v. Christian, 245 S.W.2d 895 (Mo.1952). There, notes from defendant asking help in testimony from a fellow prisoner, offering him money, and suggesting the desired testimony were held admis-

sible as evidence of guilt. The Court said, in part, loc. cit. 898: "There can be no question about the admissibility of these exhibits. 'An attempt to fabricate evidence is receivable as evidence of one's guilt of the main facts charged.' 20 Am.Jur. 272, Sec. 289; see also 20 Am.Jur. 192, Sec. 186, p. 265, Sec. 280; 22 C.J.S. Criminal Law § 633, p. 966. Such an attempt is construed as being in the nature of an admission of guilt and we find no authority against receiving it in evidence. The latest case in this Court is State v. Smith, 355 Mo. 59, 194 S.W.2d 905, 907, in which we said: 'Evidence to show that an accused has attempted to fabricate or procure false evidence or destroy evidence against him is always admissible as showing consciousness of guilt. State v. Mathews, 202 Mo. 143, 100 S.W. 420. "Evidence of the fact of an attempted subornation is admissible as an admission by conduct that the party's cause is an unrighteous one." Fulkerson v. Murdock, 53 Mo.App. 151, loc. cit. 154. See also State v. Howe, 287 Mo. 1, 228 S.W. 477.' " No further authority is needed, but see also State v. Spica, 389 S.W.2d 35, (Mo.1965), cert. denied 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312. Defendant cites Crockett v. Morrison, 11 Mo. 3 (1847), Wright v. Quattrochi, 330 Mo. 173, 49 S.W.2d 3 (1932), and Stockton et al. v. Tester et al., 273 S.W.2d 783 (Mo.App. 1954), as holding that admissions of law are not competent evidence; he also cites Jockel v. Robinson, 484 S.W.2d 227 (Mo. 1972) as holding that a mere conclusion of plaintiff, explained by other evidence, is not binding upon him. No one contends here that these letters and the inferences therefrom were conclusively binding upon defendant,—nor does any one contend that they constituted "judicial admissions," as counsel seems to think necessary. And they certainly need not be part of the res gestae. These cases cited by defendant are inapplicable on our facts. The references in the letters to "telling on each other" and going to the penitentiary, whether they be conclusions or not, when taken in context, clearly constituted evidence of a state of

mind indicating guilt. That is the basis of admissibility. Defendant's objections that the letters were immaterial, and that they were not admissions against interest, are wholly untenable. The only specific objection made to the statement about going to the penitentiary was that it had no value whatever, that it was not an admission, and that it was not a threat. The objection stated no sufficient ground; but, even so, that statement, in context, was clearly admissible as already indicated. Aside from the letters, Spencer testified that defendant had asked him orally to change his statement. One statement in defendant's brief is enlightening, namely: "It is apparent that the Defendant was worried about his situation. He endeavors to get Spencer to help him by changing his testimony. While this might be admissible as admissions against interest, it would only establish that Defendant stabbed Lane, but not that the stabbing was one of first degree murder." The State did not rely on the letters alone to establish deliberation and first degree murder. Defendant's first point is of no real merit and is denied.

In this second point defendant relies strongly on the failure of the court to declare a mistrial when the State's attorney said that those parts of the letters "prejudicial" to the defendant had been excluded. It was conceded by all that the statement was inadvertent; the Court expressed some doubt as to whether the statement was made loudly enough for the jury to hear it, but the Court and counsel for the State, in effect, offered to take any action the defendant wished, short of a mistrial. Defendant's counsel insisted upon a mistrial. After much discussion of possible admonitions by the court to the jury, and their possible effects, the court told the jury "that the last statement made by the attorney for the State is not to be considered by you in your deliberations on this matter." In the colloquy the trial court said: "Gentlemen, in the absence of a stipulation as to what you want me to tell the jury, it is the Court's feeling that the statement made is not of such a nature as to warrant this Court declaring a mistrial on the basis, number one, as I have already stated, I am not sure that the statement was heard by all of the jury, if any, and I am not saying as a matter of fact that they did not hear it, but secondly I don't feel that the statement made was of such a nature as to prejudice this jury so as to preclude them from deciding this case on the facts. I don't believe the statement is of such a nature as to indicate that the defendant will not get a fair and impartial trial."

Defendant relies largely upon authorities which hold that a prosecutor must be fair at all times, that he has the duty to protect the innocent as well as to convict the guilty, and that he must refrain from intemperate statements and argument. 23A C.J.S. Criminal Law § 1081; State v. Genova, 242 Wis. 555, 8 N.W.2d 260 (1943); People v. Carr, 163 Cal.App.2d 568, 329 P. 2d 746 (1958); United States v. McCaskill (CA8), 481 F.2d 855 (1973). Two other cases are cited for the rule that, to a large extent, the rulings in such matters rest within the discretion of the trial court. There can be little or no controversy about these general duties of the prosecutor; and otherwise the cited cases have no real applicability here. In many of the cases where mistrials were granted there appeared some conscious, if not intentional, violations of the duties of the prosecutor. In McCaskill, supra, the Court criticized an argument of the government attorney regarding defendant's supposed knowledge of the location of a missing witness, although defendant had been precluded from showing the circumstances and the efforts to locate him.

The Courts of Missouri have long recognized the rule that the granting of a mistrial for supposed misconduct of counsel or a witness is a drastic remedy which should only be exercised in extraordinary circumstances, and when the effect can be removed in no other way; and, further, that the determination of such matters rests

largely in the discretion of the trial court, which is in a better position than the appellate court to evaluate the prejudicial effect. And the appellate court acts only when the trial court has abused that discretion. State v. Camper, 391 S.W.2d 926 (Mo.1965); State v. James, 347 S.W.2d 211 (Mo.1961); State v. Duncan, 499 S.W.2d 476 (Mo.1973); State v. Jackson, 499 S.W.2d 467 (Mo.1973); State v. Cuckovich, 485 S.W.2d 16 (Mo.banc 1972); State v. Smith, 431 S.W.2d 74 (Mo.1968); State v. Tallie, 380 S.W.2d 425 (Mo.1964); State v. White, 440 S.W.2d 457 (Mo.1969).

■ In this situation the prosecutor obviously made an inadvertent statement which he should not have made. It was not made with the intent to unfairly injure the defendant. After full discussion no one could suggest a better caution to the jury than was given by the Court. The Court expressly determined that counsel's statement was not of such a nature as to prevent a decision "on the facts." Counsel for the State was apparently explaining why he was reading from the typed excerpts rather than from the original letters; no one can say just what, if any, inference the jury may have drawn from the statement (if heard), abstract and indefinite as it was. The evidence for the State was strong, this was one incident in a long trial, and it is impossible for us to say that the Court abused its discretion in denying a mistrial; such a slip as this would ordinarily weigh rather lightly in the mass of such damning evidence as there was in this case. The point is denied.

■ Defendant's last point is that there was no evidence of deliberation and that the instruction on first degree murder was erroneously given. There is no doubt that the existence of deliberation is the key factor in deciding whether a killing constitutes first or second degree murder. Defendant cites State v. Snow, 293 Mo. 143, 238 S.W. 1069 (1922) as evidencing this distinction, but there are many later cases. State v. Davis, 400 S.W.2d 141 (Mo.1966);

State v. Davis, 472 S.W.2d 389 (Mo.1971); State v. Clark, 494 S.W.2d 26 (Mo.banc 1973); State v. Smart, 485 S.W.2d 90 (Mo.1972). The judgment in State v. Davis at 400 S.W.2d 141 was vacated because of the lack of counsel on appeal but the same result was reached on the same reasoning at 472 S.W.2d 389. These cases hold: that deliberation is a necessary element in first degree murder, but that it may be inferred from and established by the circumstances; that it is sufficient if there is a fair inference that the defendant had time to think and intended to kill, even for a moment; that the killing must be in the "cool of the blood," but that no appreciable time need elapse between the intention to kill and the killing; and that if the killing was done from the "free act of the will" there is sufficient deliberation. In such considerations the carrying of a concealed weapon, and the use of it upon a vital part of the body of the victim are deemed to be highly material circumstances. The suggestion that these parties may have had a "hot" argument before Spencer came out, so as to preclude any "cool state of the blood" is purely speculative. The evidence on what actually happened is clear. The argument that it would have been difficult for defendant to stab Lane as he did if he was standing a step lower, goes merely to the weight of the evidence. The jury decided that.

■ The Court here gave both second degree murder and manslaughter instructions. The jury accepted neither. We look to the circumstances for evidence of deliberation. It is clear that defendant resented Ronald Lane's supposed attentions to Earlene Spencer, whom defendant had made pregnant, and then "had broken up" with. He continued to visit her occasionally and was at her house at around 8:30 on the evening in question, but she told him to leave. Defendant testified that at that time Earlene's little brother told him that a fellow named Ronald had asked where he (defendant) worked and where he "stayed at." Defendant, in leaving, met

Thomas Spencer, asked if he knew a boy named Ronald, and said that Ronald, who was down at Rosalind's (how he knew is unexplained), was "messing" with Spencer's sister. The two then proceeded to Rosalind's and, as already related, defendant asked for Ronald, had him step outside, accused him of "messing with his woman" and very promptly drew his knife and stabbed him. That evidence gives rise to a substantial inference of deliberation, a consideration of his grievance against Lane, the inception of an intent to kill him, and an exercise of the "free act of the will" in the slaying. The possession and concealment of the long knife and the very prompt use of it in the confrontation are highly material elements. There was sufficient evidence of deliberation and the point is denied.

Finding no reversible error the judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.