STATE of Missouri, Plaintiff-Respondent,

v.

Clyde Henry BERRY,
Defendant-Appellant.

No. 9444.

Missouri Court of Appeals,
Springfield District.

July 30, 1975.

Clyde R. Allemann, White, Dickey & Allemann, Springfield, for defendant-appellant.

John C. Danforth, Atty. Gen., Scott A. Raisher, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before STONE, P. J., and HOGAN and FLANIGAN, JJ.

FLANIGAN, Judge.

Defendant Clyde Henry Berry, charged as a second offender, § 556.280 V.A.M.S.,[1] was found guilty by a jury of the offense of manslaughter, § 559.070, and was sentenced to a prison term of eight years, § 559.140. Defendant appeals.

The information, in addition to alleging the prior conviction, charged the defendant

1. All statutory references are to RSMo 1969, V.A.M.S.

with the first degree murder of Mildred L. Moody by use of a knife.

■ The first of defendant's four contentions is that the evidence is insufficient to support the conviction. In determining the validity of that contention, this court must view the evidence in the light most favorable to the state, accept all substantial evidence and all legitimate inferences fairly deducible therefrom tending to support the verdict, and reject contrary and contradictory evidence. *State v. Petrechko,* 486 S.W.2d 217 (Mo.1972). This court must disregard all evidence unfavorable to the state and reject all inferences unfavorable to the state. *State v. Summers,* 506 S.W.2d 67, 69 (Mo.App.1974). The defendant offered the testimony of himself and other witnesses and thus the submissibility of the case will be determined upon all of the evidence. *State v. Sykes,* 372 S.W.2d 24, 25[2] (Mo. 1963); *State v. Chester,* 445 S.W.2d 393 (Mo.App.1969).

■ It is not the function of this court to determine the credibility of the witnesses or to weigh the evidence. *State v. Small,* 423 S.W.2d 750, 751[2] (Mo.1968). The effects of conflicts or inconsistencies in any testimony are questions for the jury. *State v. Turnbough,* 497 S.W.2d 856, 858[5] (Mo. App.1973). The jury may believe all or none of the testimony of a witness, or may accept it in part or reject it in part, just as they may find it to be true or false when considered in relation to other testimony and the facts and circumstances of the case. *State v. Wynn,* 391 S.W.2d 245 (Mo.1965).

■ In a circumstantial evidence case, the state is required to prove facts and circumstances consistent with the guilt of the defendant and inconsistent with any reasonable theory of his innocence, *State v. Keller,* 471 S.W.2d 196, 198[1] (Mo.1971), but the circumstances need not demonstrate an absolute impossibility of innocence. *State v. Phillips,* 452 S.W.2d 187, 189[2] (Mo.1970).

■ The victim of the offense was Mildred L. (Mickey) Moody, a former wife of the defendant. The principal events took place on May 15, 1972, at defendant's home in Springfield, Missouri. At the time of her death, Mickey was the wife of Junior Moody and they lived at 1426 Ethyl, "about 10 minutes from defendant's home."

After divorcing Mickey, defendant married Anna. Although defendant was divorced from Anna prior to the date of the offense, he and Anna continued to live together in the four and one-half room house located at 2041 N. Marion. The house faces east and is located at the northwest corner of the intersection of West Lee and North Marion.

During the afternoon of May 15 Mickey, Junior, Anna and the defendant were in the kitchen of defendant's home, drinking wine. Three months earlier Anna had heard Mickey tell the defendant "Don't you ever hit Anna in my presence or I will whip you."

Anna testified that Junior, when he drank, was a pleasant person and did not get violent. The same was true of Mickey and Anna. However, when the defendant drank, according to Anna, he was "an entirely different person . . . he is violent." During the afternoon, while the four people were together, defendant and Anna had an argument about a pepper plant and defendant struck Anna. This caused her mouth to bleed and she also received an injury to her forehead.

Junior left the defendant's house and he never saw Mickey alive thereafter. After Junior left, the defendant kept "cussing" and "raving." Anna was struck again by the defendant. This time he hit her with his fist and knocked her through a door into a room on the west side of the defendant's house. Defendant's second assault upon Anna caused injuries to her head and "broken ribs on both sides."

The defendant's height was 6'2" and he weighed about 230 pounds.

Anna got up off the floor, after the defendant's second attack, and went out the

back door. Witness Jack Watson saw her departure. She entered a house located west of that of the defendant and went to sleep upon a bed. The next thing she remembers was being awakened by the police.

When Anna left the defendant's house the only two people there were the defendant and Mickey. Mickey was alive and uninjured, sitting in a chair in the kitchen, and the defendant was in the kitchen. A paring knife and a butcher knife were in the kitchen. No curtain was torn down while Anna was in the defendant's house and the kitchen curtain was still in proper position when she left.

Junior testified that after he had been home about an hour he returned to defendant's house about 5:30 p. m., and parked his automobile on Lee Street, south of the house, and entered the front door. He was only a step or two into the house when he was met by the defendant. For reasons unknown to Junior, the defendant attacked Junior with a knife and Junior was cut in the upper arm. Junior drove home and called the police.

Rev. Thomas Boaz was mowing a nearby lawn, about 5:30 p. m., and saw Junior park his car and walk to the front door of defendant's house. A fist came "through the door" at Junior and Junior left the premises immediately and drove away.

Jack Watson testified that he lived in a house located at the southwest corner of the intersection of West Lee and North Marion. Watson's house faces north and is about 75 feet from the defendant's house. Between 5:32 p. m. and 5:37 p. m. Watson, from his porch, saw Junior depart in Junior's 1966 Plymouth. After Watson saw Junior leave, and while Junior's car was no longer in the area, Watson heard some banging noises emanating from the defendant's kitchen and saw a curtain being pulled down.

Mickey weighed about 200 pounds and was 5'10" tall. She was larger than Junior or Anna, both of whom denied killing her. About 25 minutes after Watson heard the banging noise, the defendant came out the back door of his house, went to the front yard and then came across to the Watson house. Defendant told Mr. and Mrs. Watson that there was a murdered woman in his house and that Anna had left with Junior. Mrs. Watson told the defendant that Anna had not left with Junior but had gone down the street to another house. The defendant said "No, she went with Mr. Moody, don't argue with me." The defendant had blood across the knuckles of both of his hands. He told Mrs. Watson "Well, I guess I got it off of her." The police arrived twenty minutes later.

Photographs of the victim showed her lying on the kitchen floor, the upper portion of her body in a pool of blood. The butcher knife had penetrated the body almost to its hilt and its direction of entry was toward the front of the body.

Dr. E. B. Hanon, a pathologist, conducted an autopsy of Mickey's body on May 16. His examination disclosed multiple stab wounds. The knife was sticking out of the back just to the left of the spinal cord about the level of the fifth and sixth thoracic vertebrae. Just above the knife was a stab wound about 1¼ inches long in the same line and just to the left of the spinal column about the level of the second and third thoracic vertebrae. This wound had deviated to the right, cut across the posterior layer of the spinal column, entered the spinal canal and severed the spinal cord. The wound was apparently made by the same knife which was sticking in the body. The knife blade measured 7½ inches in length and had penetrated the body a distance of 6¾ inches. There was another stab wound, about four inches across, just below the axilla. There were knife point bruises on the shoulder. Death would have occurred "within a period of a few minutes." There was a palm wound which was consistent with the deceased attempting to fend off a knife. Dr. Hanon also testified that it would not have been possible for the wounds to have been self-inflicted.

After the police officers arrived, sometime after 6 p. m., Officer Allen entered the house and discovered the dead body. The officers observed blood on the defendant's shirt and pants and on the knuckles and palms of his hands. The defendant also had a faint scratch across his mid-abdomen. The defendant's handkerchief was blood-stained as were his shoes. His shirt was disarranged.

Police photographs of the kitchen showed evidence of a struggle. Mickey's watch was lying on the floor near the body and the curtain, normally attached to the kitchen window, was lying across the breakfast table and the curtain rod itself was out of position.

During the ride to the police station the defendant threatened the officers. The defendant previously had been given the Miranda warnings.

The defendant told one of the police officers that he had been asleep, heard a noise, went to a window and saw Junior speeding away. Officer Charles Ritter heard the defendant say that Anna had left with Junior. He was the officer who found Anna in the bedroom asleep. Defendant told the Watsons that he guessed "I would be blamed for this." He told a police officer that Junior had done the killing.

At the police station the defendant told Anna "to keep her damn mouth shut." Defendant admitted the two assaults on Anna and said that he had "bloodied her up" on prior occasions. He also stated that he did not know how long Anna stayed around after the second assault upon her but she did not leave immediately.

The defendant admitted that he had seen the butcher knife in his home many times and had used it the night before. He also admitted it was possible that three or four days previously he had told Mickey to shut her mouth or he would shut it for her. Another witness testified that a few days before May 15, he had heard the defendant make that statement to Mickey.

"Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." § 559.070 V.A.M.S.

Although the offenses of murder in the first degree and murder in the second degree were also submitted to the jury, the propriety of those submissions is not in issue. The jury found the defendant guilty of manslaughter.

The following findings were justified by the evidence and, collectively, they support that conviction. The defendant had a violent temperament; Mickey had warned him not to strike Anna or she would whip him; the defendant struck Anna and, after Junior had gone, struck her again in Mickey's presence; Anna left the house, leaving the defendant alone with Mickey in the kitchen; Mickey was uninjured when Anna left and the kitchen curtain was in proper position; Junior returned and was the recipient of an unexplained knife attack by the defendant; after Junior had gone, the kitchen was the scene of a struggle and the curtain was pulled down; Mickey's wounds were not self-inflicted and the defendant was powerful and large enough to inflict them; the butcher knife was accessible to the defendant and he was familiar with it; the defendant had blood on his hands and clothes and gave the Watsons false information concerning the departures of Junior and Anna; the defendant told the Watsons he would be blamed for this; the defendant three or four days prior to Mickey's death had threatened her.

In *State v. Stapleton*, 518 S.W.2d 292 (Mo. banc 1975) in affirming a manslaughter conviction, the court held that there was sufficient circumstantial evidence to warrant a second degree murder submission. The defendant asserted that there was no evidence to support a manslaughter instruction for the reason that there was no evidence of provocation by the deceased and thus no evidence to support a reduction of the homicide from murder to manslaughter. The court rejected that contention.

In this case, as in Stapleton, there was no evidence of provocation by Mickey, but that is no bar to a manslaughter submission. There is no claim of self-defense nor any evidence to support such a claim. The circumstances shown by the evidence are "consistent with each other and wholly inconsistent with the innocence of the accused, and incapable of explanation upon any other reasonable theory except that of his guilt." *State v. Stapleton, supra,* at p. 296.

The evidence is sufficient to support the conviction. *State v. Stapleton, supra* ; *State v. Paige,* 446 S.W.2d 798 (Mo.1969); *State v. Bayless,* 362 Mo. 109, 240 S.W.2d 114 (1951).

Defendant's second contention is that the trial court erred in admitting into evidence certain items[2] obtained by police officers from the interior of defendant's house. Defendant relies on the Fourth and Fourteenth Amendments to the Constitution of the United States and § 15 of Article I of the Constitution of the State of Missouri, V.A.M.S. It is conceded that the officers had no search warrant when they entered the premises. Defendant made his objection by a pre-trial motion to suppress and renewed it at the trial.

■ The ban of the Fourth Amendment against unreasonable searches and seizures applies to the state through the due process clause of the Fourteenth Amendment. *State v. Witherspoon,* 460 S.W.2d 281, 283[1] (Mo.1970), but a search may be made without a warrant under one of the few, specific, well-recognized exceptions to the ban. *State v. Rush,* 497 S.W.2d 213, 215 (Mo.App.1973). A search conducted pursuant to a valid consent is constitutionally permitted and is "wholly valid." *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). In relying upon consent to justify the lawfulness of a search, the state has the burden of proving that the consent was, in fact, "freely and voluntarily given." *Schneckloth, supra,* 93 S.Ct. 2041, 2045.

■ Whether a consent to search was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined from the "totality of all the surrounding circumstances." *Schneckloth, supra,* at 2047. In situations where the police have some evidence of illicit activities, but lack probable cause to arrest or search, the search authorized by a valid consent may be the only means of obtaining important and reliable evidence. *Schneckloth, supra,* 93 S.Ct. at 2048.

■ To show consent the state must show more than mere acquiescence to a claim of lawful authority. *State v. Rush, supra,* at 215. While a person's knowledge of the right to refuse consent is a factor to be taken into account, as part of the circumstances, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. *Schneckloth, supra,* 93 S.Ct. at 2059.

■ In determining whether there is a voluntary consent to search, the court may consider such factors as the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in police custody, whether there was any fraud on the part of the officers, the acts and statements of the consenter, and other matters comprising "the totality of the circumstances." *State v. Rush, supra,* at 215.

The state seeks to justify the warrantless entry on several grounds, including that of consent. Since this court finds that consent is disclosed by the totality of the circumstances, the other grounds require no consideration.

The evidentiary background to the warrantless entry is contained in the testimony

2. The butcher knife which inflicted the fatal injury, pieces of a broken dish, a curtain and curtain rod, deceased's purse, a paring knife, a dish towel and a wrist watch. The police also took photographs of the interior and made measurements from which a floor plan was prepared.

of Jack Watson, Mrs. Jack Watson, Officer Dale Wagner, Officer Michael Allen and the defendant.

Defendant testified that late in the afternoon he went to the nearby home of Jack Watson and asked Watson to call the police. He told Watson "There was some trouble at my house." He said there was a body on the floor and somebody was hurt bad, and that "I needed help bad."

The defendant said that Mrs. Watson did call the police and the two officers came. Officer Wagner asked the defendant where the trouble was and the defendant answered "In the house; I pointed to the house, the house I was living in." The defendant said he did not know if any other person was in the house at that time. The defendant was in his yard when the police arrived and remained there while the entry was made by Officer Allen. The defendant admitted that it was possible that he said to the officer "She's in the house."

Jack Watson testified that when the defendant came to Watson's house the defendant said there was a murdered woman or a dead woman at his house. The defendant said that Anna and Junior had previously left the house together.

Officer Wagner testified that at approximately 6:10 p. m. he and Allen, in a patrol car, received a radio message dispatching them to 2041 N. Marion "in regard to a disturbance at that location." The officers were in uniform. As Allen was parking the patrol car in front of the Berry home, the defendant, who was in the yard, came up to the officers. The defendant told Wagner "The man you want is Junior Moody." Wagner asked him why and the defendant said "He is driving," and gave a description of a car. The officer asked what the trouble was and the defendant raised his right hand and pointed toward the front door of the Berry house and said "She's in there."

Wagner stayed with the defendant while Officer Allen went to the front door and entered the Berry home. Allen returned shortly and said "Dale, I think we have a stabbing." When Allen crossed the yard and entered the house, the defendant voiced no objection. Wagner testified that "I took it as implied consent after I asked him what the trouble was and he pointed to the house and said 'she's inside,' taking it that maybe whoever was inside was the one creating the trouble."

The front door of the defendant's house opened into the living room. The house faces east, and the living room is on the southeast corner. Immediately west of the living room is the kitchen. The prone body of the victim was on the kitchen floor, with its feet extending slightly into the living room so that the victim was visible to Officer Allen as he entered the front door.

The photographs mentioned in Footnote 2, taken by a police photographer, showed various views of the kitchen, the body, and the back room which was immediately to the west of the kitchen. The other items mentioned in Footnote 2 were in the kitchen, all in plain view of a person standing at the kitchen entrance.

■ The following factors support the conclusion that the defendant consented to the search: The defendant himself, through Mrs. Watson, summoned the police to his premises. The defendant knew that Mickey was dead and also knew that Anna and Junior had previously departed and that no other person was in the house. The defendant "needed help bad." When the two uniformed officers arrived, they made no "emphasis of their authority" and displayed no weapons, although they were wearing sidearms. The defendant was not then under arrest, and the officers did not solicit an invitation to enter the home. The defendant, standing in his yard, pointed to his front door and told the officers "She's inside." Though the officers did not then know to what person the defendant was referring, the defendant knew that he was referring to the deceased. In the mind of the defendant, his message to the officers translated into "A dead woman is in there."

This statement, made while the defendant pointed his hand toward the door, reasonably caused the officers to believe, and they testified they did believe, that they were being asked to enter the premises to investigate the situation. That invitation was accepted. The defendant made no objection to the entry.

The defendant's consent to the entry was in fact voluntary and was not the product of duress, express or implied. The search was conducted pursuant to a valid consent.

■ Appellant's brief, in discussing the "consent" issue, states but does not stress that appellant was intoxicated when Officers Allen and Wagner arrived. There was testimony to that effect. Intoxication, though a factor to be considered, is not determinative "of the voluntariness of waiver of rights issues." *State v. Heather*, 498 S.W.2d 300, 304 (Mo.App.1973). In *State v. Smith*, 342 S.W.2d 940, 941[3] (Mo. 1961) our Supreme Court held that the fact that a defendant was "more or less" intoxicated when he confessed did not render the confession inadmissible if he had sufficient mental capacity to know what he was saying.

In *United States v. Leland*, 376 F.Supp. 1193, 1199 (D.C.1974) the court held that the intoxication of a consenter to a search, as bearing upon the validity of the consent, is to be judged by the same standard as that used for determining whether a confession, given while intoxicated, was voluntary.

■ The fact that the defendant was intoxicated, at least to some extent, when he consented to the search is only one of the circumstances, the totality of which must be considered in determining whether the consent was voluntary.

In *Heather, supra*, a statement by the defendant was held to be admissible, although in the opinion of the officers he was intoxicated. The court held that the evidence reflected that the defendant "had

sufficient capacity to waive his Miranda rights and to make a voluntary statement."

■ The evidence in this case fails to show that Berry's intoxication was "so extreme" that the court was compelled to conclude his consent "was not the product of a rational intellect and a free will." *Heather, supra*, at p. 304.

Defendant's second contention has no merit.

Defendant's third contention is that the trial court erred in admitting into evidence certain statements made by the defendant to police officers and to Anna.

Officers Allen and Wagner had arrived at defendant's home at approximately 6:15 p. m. Shortly thereafter Officer James Newton arrived for the purpose of supervising the investigation. Newton arrested the defendant and gave him the Miranda warnings. Then Officers Allen and Wagner took the defendant and Anna in the police car to the police station.

On the way to the station the defendant threatened Wagner by saying "You goddamn sonofabitch, I will get you whenever I get out of this." At the police station the defendant told Officer Ray Benton that he knew he was going to die in jail but "he was going to take a bunch of us with him." The following morning the defendant said to Anna "Keep your damn mouth shut."

■ The foregoing evidence was admissible. In *State v. Cade*, 326 Mo. 1132, 34 S.W.2d 82 (1930) witnesses were permitted to testify to threats made against them by defendant while he was being taken to jail. In *State v. Mason*, 394 S.W.2d 343, the defendant, following his preliminary hearing, told a state's witness "I will get you before they try me." The court said that evidence of threats of the defendant against witnesses against him is admissible "to establish his guilt on the original charge," and that evidence showing that

the accused has attempted to destroy evidence against himself "is always admissible as showing a consciousness of guilt." To similar effect see *State v. Corlew,* 463 S.W.2d 836, 840[5].

"The general rule is that acts, conduct, and declarations of the accused occurring after the commission of an alleged offense which are relevant and tend to show a consciousness of guilt, or a desire or disposition to conceal the crime, are admissible in evidence." *State v. Walker,* 357 Mo. 394, 208 S.W.2d 233, 236[1] (Mo.1948).

Defendant's third contention has no merit.

Defendant's fourth contention is that the trial court erred in overruling defendant's motion for a mistrial based on remarks in the prosecutor's opening statement to the jury.

At the outset of his remarks, the prosecutor told the jury that he was going "to present to you what the evidence will be from my witnesses." After outlining certain evidence, he stated that a police officer would testify that he took Junior into custody.

The following then transpired:

Prosecutor: "He (Junior) was arrested for investigation of murder on probable cause, that is correct, and that Junior Moody did not resist, that he gave a written statement to the police immediately afterwards, that he fully cooperated with them, and later testified in open court at a preliminary hearing, at which he was subject to cross-examination by the defense counsel. Secondly, Anna Berry was also arrested for investigation of murder on probable cause, was taken into custody, she gave an oral statement to the police officers and in her oral statement she stated to the police officers that Clyde Berry had killed—

Mr. Yocom: Now, I object to this. May we approach the Bench on this?

The Court: You may.

Mr. Yocom: I want to ask for a mistrial on this, too."

Outside the hearing of the jury, counsel for defendant told the court that the transcript of the testimony at the preliminary hearing showed that Anna testified that she did not see Clyde Berry kill anybody. The prosecutor agreed that such was Anna's testimony at the preliminary hearing but told the court the state's evidence would be that Anna, shortly after her arrival at the police station on the day of the offense, told the officers that she saw the defendant strike Mickey with a knife, that Anna then talked to a defense attorney on the telephone and "immediately changed her story." The prosecutor also informed the court that he intended to request permission to cross-examine Anna "because she is going to be a hostile witness."[3] During this colloquy at the bench, counsel for defendant stated that any statement made by Anna to the police was objectionable on the ground of hearsay.

The court then denied the motion for mistrial.

The defense attorney then requested the court "to admonish the jury to completely disregard that statement about what evidence is going to be put in on the statement from Anna . . . We are asking the Court to, at this time, before the damage is done, before the jury goes out all night long hearing what he said." Defense counsel

---

3. "[O]ne may not impeach the witness he has called when he well knows in advance that the witness' evidence is going to be unfavorable and adverse, as, for example, when the witness' deposition has been previously taken and his evidence was then adverse to the party calling him. In that event there is no surprise to the party calling him and no unexpected benefit to the adverse party. And, of course, in that event the party is not misled or entrapped by the witness." *Crabtree v. Kurn,* 351 Mo. 628, 173 S.W.2d 851, 859[11, 12] (1943).

then moved, in the alternative, for a mistrial or for an instruction to disregard.

When the jury returned to the court room the court instructed them "to disregard and set out of your minds and it is stricken from the record the statement made by Mr. Wampler to the Jury to the effect that Anna Berry had made a certain statement to one of the officers."

The next morning, counsel for both sides conferred with the court in chambers. The *prosecutor* requested the court to make the following statement to the jury: "Any statements made by the prosecutor in his opening statement with regard to anything Anna Berry might have said to police after being taken into custody is to be disregarded and the prosecutor is admonished not to refer to this."

Defense counsel were shown this admonition in chambers but did not then request that the statement not be given. The jury was brought in and it was given.

The prosecutor then stated that he had concluded his opening statement and told the bailiff to call Junior as the first witness. Defense counsel then stepped to the bench and renewed the motion for mistrial, stating with reference to the second admonition "Further damage has been done by emphasizing it at the request of the prosecutor."

■ The purpose of the opening statement is to advise the jury of the facts which the state expects to prove. *State v. Feger,* 340 S.W.2d 716, 724 (Mo.1960). It is improper for a prosecuting attorney, in his opening statement, to indicate that certain evidence will be adduced if he knows that such evidence will be inadmissible upon objection. State v. Stillman, 310 S.W.2d 886, 888[2] (Mo.1958). The prosecuting attorney is charged with the duty to see that a person on trial is afforded a fair trial. *State v. Fenton,* 499 S.W.2d 813, 815 (Mo. App.1973). See also 63 Am.Jur.2d Prosecuting Attorneys § 27, p. 355.

■ Whether or not remarks of counsel are improper, and whether or not improper remarks are prejudicial under the particular facts of the case and necessitate a reprimand of counsel or discharge of the jury are matters resting very largely within the trial court's discretion and an appellate court will not interfere unless the record shows an abuse of such discretion to appellant's prejudice. *State v. Chester,* 445 S.W.2d 393, 399[11, 12] (Mo.App.1969). See also *State v. Stapleton,* 518 S.W.2d 292, 301 (Mo. banc 1975).

The most significant portion of the opening statement was "In her oral statement she stated to the police that Clyde Berry had killed—"

Anna Berry testified at the preliminary hearing, and this court has reviewed that transcript, as did the able and experienced trial judge. It does not contain testimony by Anna that she saw Clyde Berry kill anyone or that Clyde Berry did kill anyone.

The statement was hearsay and there is nothing in the record to show that Anna Berry's statement was admissible under any of the exceptions to the hearsay rule. The defendant was not present when Anna was interviewed by the police.

Thus, the prosecuting attorney was in error in making his remark. During the first bench conference, capable counsel for the defendant, after his initial motion for mistrial was overruled, asked the court to admonish the jury to disregard the statement "before the damage is done."

The next morning the prosecutor himself, conscious that he had exceeded the limits of tolerable zeal, asked the court to renew the instruction to disregard and to append to it an admonition to the prosecutor to make no additional reference. Though defense counsel stated, after the second admonition had been given, that further damage had been done, defense counsel had the opportunity in chambers to have protested the giv-

ing of the second admonition but made no such protest.

■ Although this court condemns the conduct of the prosecutor in making the improper remark, there is no claim or showing of bad faith on his part. Although the discretion of the trial court is not absolute, this court does not feel that there has been an abuse of the discretion in failing to apply the drastic remedy of declaring a mistrial. *State v. Levy*, 262 Mo. 181, 170 S.W. 1114; *State v. Heather*, 498 S.W.2d 300, 303[1, 2] (Mo.App.1973); *State v. Raspberry*, 452 S.W.2d 169, 173; *State v. Dennison*, 428 S.W.2d 573, 577 (Mo.1968).

Defendant's fourth contention, the resolution of which was not free of difficulty, is overruled.

There is no error in the matters of record reviewed pursuant to Rule 28.02 V.A.M.R.

The judgment is affirmed.

All concur.