STATE of Missouri,
Plaintiff-Respondent,

v.

Wayne SIPES, Defendant-Appellant.

No. 12873.

Missouri Court of Appeals,
Southern District,
Division Three.

May 2, 1983.

John D. Ashcroft, Atty. Gen., Sandra K. Stratton, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Charles F. Stegmeyer, Storment, Stegmeyer & Read, St. Louis, for defendant-appellant.

PREWITT, Judge.

A jury found defendant guilty of attempted rape, § 566.030, RSMo Supp.1982, and sodomy, § 566.060, RSMo Supp.1982.

He was sentenced to ten years imprisonment for attempted rape and fifteen years for sodomy, the sentences to run consecutively.

We first discuss defendant's contention that the trial court erred in denying his motion for acquittal because the prosecutrix's testimony was contradictory and unconvincing and there was insufficient corroboration of her testimony. The testimony of a prosecutrix is sufficient to sustain a rape or sodomy charge without other corroboration unless that testimony is so contradictory or in conflict with physical facts, surrounding circumstances, and common experience as to be unconvincing. *State v. Johnson,* 595 S.W.2d 774, 776 (Mo.App. 1980); *State v. Phillips,* 585 S.W.2d 517, 520 (Mo.App.1979). Her testimony is related in the next four paragraphs.

She testified that defendant came to their house in the morning while she and her husband were still in bed. They knew defendant through their church and she and her husband had worked for him. After her husband and defendant left for awhile, they came back to the house. Defendant was drinking from a "bottle of some type of stuff." Then she, her husband and a friend of her husband got into defendant's pickup truck to go to a market where defendant proposed to sell a boat that he had in the back of his pickup. On the way to the market defendant stopped the truck, apparently in a rural area, and suggested that there would be a better chance of selling the boat to the owner of the market if only the prosecutrix accompanied him since she was a friend of the owner's family. The others agreed and were left at a place called "Double Bridges". They were to be picked up after the boat was sold.

Before they got to the market defendant turned off the road leading to it and onto a gravel road. He stopped the truck, and "using vulgar language" informed the prosecutrix that he wanted to have sexual intercourse with her. She opened the truck door and started to leave it when he grabbed her by the neck and pulled her over against him and tried to kiss her. When that happened she lost a button from her blouse. She was scared and crying and asked him to take her back to her husband. He told her that she was not going to see her husband or family any more. That statement made her afraid that "he was gonna kill me." He then drove the pickup on down the road where there were trees on one side and a pond on the other and told her, "There's dead people in that pond." Then he told her to take her clothes off and she said she didn't want to. She was wearing shorts and a blouse and no undergarments. He told her to look in the glove box for cigarettes and she did. There were no cigarettes, but she saw bullets. She knew that he frequently carried a gun and believed he might have one under the seat.

She took her shorts off because she was afraid of him. "Then he made me get down on the truck seat" with her head toward the passenger's side, and "started havin' oral sex" by putting his tongue inside her "sexual organs". He was standing outside the truck with the door on the driver's side open. While this occurred she was crying and he put his fist toward her face and told her, "You better shut up." The "oral sex" went on for what "Seemed like a long time". Then he told her, "to come". After she replied that she could not, defendant said that if she didn't, he would make her have oral sex with him. Then she "felt something strange go up toward my vagina" and saw it was a hammer handle in defendant's hand. She asked him not to do that and he put it "back in the back of the truck." Then he tried to have intercourse with her but because his penis was not erect it would not enter her vagina. He then let her get up and put her clothes back on and said, "I didn't get you this time but I'll get you the next time."

While putting on her clothes she saw a tractor "across from us" and jumped out of the pickup and started running through a soybean field toward the tractor, screaming and waving so its operator would notice her. She heard the pickup and saw it was coming straight toward her. Defendant stopped the truck close to her, "gritted his

teeth" and told her, "Get in this truck." She got back into the truck because she thought she was going to be shot. She said that during the incident she received bruises on her arm, her breast and on her legs. They drove to the market and when they arrived she saw three boys in a car and "jumped out of the truck real quick and ran over to the car not knowin' 'em." She told them she had just been raped and needed help. At her request they took her to her parents' house which was nearby. Her parents called the police who came to the house and took a statement from her. Then her niece took her to a hospital where she was examined by a physician.

█ Defendant contends that the prosecutrix's testimony was contradictory and unconvincing but there is nothing in her testimony that convinces us that it was. Defendant contends that it is unconvincing because he testified that after letting her husband and his friend out they went straight to the market and because the physician who examined her testified he found no indication that a foreign object had been inserted in her vagina. The latter was not contrary to her testimony. The physician said that if a foreign body had passed the lips of the vagina it "ordinarily will leave abrasions or scratches or bruising of the lining of the vaginal canal" and he found none. This argument is obviously fallacious as she never testified that the hammer handle was inserted in her vagina, but that she "felt something strange go up toward my vagina."

Defendant further contends that the prosecutrix said she saw bullets in the glove compartment and that he had a hammer in the truck and that neither was discovered in a search of the truck later that day by a highway patrolman. Defendant had time before the search to remove those items, and a file with a wooden handle found by the patrolman could have been mistaken by the prosecutrix for a hammer handle.

Defendant also contends that her version is unconvincing because she was unable to specify where the alleged incident occurred or its approximate time and because she did not go immediately to the police or to her husband after she left defendant's pickup. She testified that she was not wearing a watch and that her awareness of the time was impaired because she was frightened and upset. Although she had lived in the area "most" of her life and knew how to get to the market, she testified that she could not drive a vehicle and did not know the roads in the area "real good". The evidence indicated that she was not familiar with the place where the offense occurred. Living in an area a number of years does not mean that she would know and could describe where every gravel road and field was located, particularly as she did not drive.

We find nothing unusual for her to first go to her parents' home which was nearby. Her husband was in a rural area without a vehicle. Defendant had said that he would return to get her husband and after such an incident it is unlikely she would want to go where defendant might be. The record does not show where the closest law enforcement personnel was located. Shortly after she arrived at her parents' home the police were called from there.

Although we do not find her testimony contradictory or unconvincing, it was corroborated. The boys in the car at the market stated that she was nervous and "really upset". She cried and her clothes were dirty. Near and at approximately the same time as she said it occurred, a farmer on a tractor in a soybean field saw a woman running from a pickup truck toward his tractor. His vision of her was obstructed by the pickup and then it drove off, apparently with the woman in the pickup. He described the pickup as being "light green or yellow". She said the pickup was yellow. Other witnesses described defendant's pickup as yellow, light tan, and light brown.

The physician who examined her at the hospital stated she was very upset, disorganized, her clothes were wrinkled and dirty, and at least one button had been pulled off. A small white button found on the floorboard of the passenger's side of defendant's truck that night was introduced in evidence

along with her blouse. The physician found bruises on her legs and on one arm, and redness about her neck, which could have been caused by "hands". On her legs he found "an abrasion approximately three inches long and an inch wide on the inner side of the right thigh and a smaller one in a corresponding position on the interior surface of the left thigh". The physician found "nothing unusual about the breasts", but his other findings closely corresponded to her version of the incident.

There was ample uncontradicted testimony of the victim to make any corroboration of her account unnecessary, but even if corroboration was necessary, her testimony was sufficiently corroborated. This point is denied.

We next consider defendant's point that the trial court erred in ruling that the button and a wooden-handled file found in his truck was admissible, because although he had purported to give his consent to the search of his truck, the state failed to establish that his consent was knowingly and voluntarily made as it was made under coercive circumstances and while he was intoxicated. The file was not seized, but the highway patrolman who made the search described it in his testimony. Defendant contends that although he was not in custody at the time of the consent to the search, the patrolman had given him the "Miranda" warning and "the coercive setting of the questioning was comparable to custodial interrogation and that this, coupled with the appellant's level of intoxication rendered any consent involuntary."

We fail to see how the consent was given during a "coercive setting". Reading the Miranda warning and questioning thereafter would not coerce defendant into giving his consent. The warning would indicate that defendant would not have to waive any of his rights. Defendant's testimony and the patrolman's both indicate that he was not so intoxicated that he could not have given his consent. Intoxication, though a factor to be considered, is not determinative of the voluntariness of a consent to a search. *State v. Berry,* 526 S.W.2d 92, 100 (Mo.App.1975). A defendant's intoxication is only one of the circumstances, the totality of which must be considered, in determining whether the consent was voluntary. Id. In our review we defer to the trial judge unless the intoxication was so extreme that the trial court was compelled to conclude that defendant's consent "was not the product of a rational intellect and a free will." Id. The intoxication here was not of an extent that the trial court was compelled to conclude that the consent was not voluntary and we defer to the trial court's ruling. This point is denied.

Defendant's final point contends that the trial court erred in allowing the state to amend the information on the day of the trial and, after allowing the amendment, in not granting him a continuance because of it. The information as originally filed did not reflect that the punishment for attempted rape at the time of the offense was contained in § 566.030, RSMo Supp.1982, and the punishment for sodomy contained in § 566.060, RSMo Supp.1982. The information referred to other statutory sections which had previously set forth the punishment for those offenses. The amendment changed the punishment references in the information from those sections to §§ 566.-030 and 566.060.

The amendments did not charge a new or different crime but correctly identified the sections which described and provided for the punishment for the crimes alleged in the information. Supreme Court Rule 23.08 states that amendments to an information may be made at any time before the verdict "if no additional or different offense is charged and if defendant's substantial rights are not thereby prejudiced." No additional or different offense was charged and defendant's substantial rights were not prejudiced.

Changing the information to reflect the proper sections that provided punishment, even if the punishment had been increased by their enactment, could not have prejudiced defendant in the trial of the case. The test of prejudice under Rule

23.08 is whether a defense under the charge as originally made would be equally available after the amendment and whether defendant's evidence would be equally applicable after, as well as before, the amendment. *State v. Leake,* 608 S.W.2d 564, 565 (Mo.App.1980). Under this test no prejudice has been shown. Defendant's brief gives no indication that his defense would have been different or that a continuance was necessary for him to further prepare for trial because of the amendment. This point is denied.

The judgment is affirmed.

GREENE, C.J., CROW, P.J., and FLANIGAN and MAUS, JJ., concur.