STATE of Missouri,
Plaintiff–Respondent,

v.

Kenneth R. BUCK,
Defendant–Appellant.

No. 15443.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 2, 1988.

Nancy A. McKerrow, Columbia, for defendant-appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Presiding Judge.

A jury found defendant Kenneth Buck guilty of stealing property having a value of $150 or more, § 570.030,[1] and he was

1. All references to statutes are to RSMo 1986, V.A.M.S.

sentenced, as a prior offender, to a term of three years' imprisonment. Defendant appeals.

Defendant's sole point is that the evidence is insufficient to support the verdict, and the trial court erred in ruling otherwise, "in that the state's evidence failed to support the jury's finding that defendant retained possession of the jewelry for the purpose of withholding it from the owner permanently or using or disposing of it in such a manner that made recovery of it by the owner unlikely, since defendant returned the jewelry immediately upon learning that the [owner] was missing it."

Section 570.030.1 reads, in pertinent part: "A person commits the crime of stealing if he appropriates property ... of another with the purpose to deprive him thereof, ... without his consent ..." As used in § 570.030, as applicable here, "deprive" means "to withhold property from the owner permanently" or "to use or dispose of property in a manner that makes recovery of the property by the owner unlikely." § 570.010(7)(a) and (c). Stealing is a Class C felony if the value of the property appropriated is one hundred fifty dollars or more. § 570.030.3(1).

In determining the validity of defendant's point, this court must view the evidence in the light most favorable to the state, accept all substantial evidence and all legitimate inferences fairly deducible therefrom tending to support the verdict, and reject contrary and contradictory evidence. *State v. Petrechko*, 486 S.W.2d 217, 218[1] (Mo.1972). All evidence unfavorable to the state must be disregarded. *State v. Unverzagt*, 721 S.W.2d 786 (Mo.App.1986). The defendant offered the testimony of himself and other witnesses and thus the submissibility of the case will be determined upon all of the evidence. *State v. Sykes*, 372 S.W.2d 24, 25[2] (Mo.1963); *State v. Berry*, 526 S.W.2d 92 (Mo.App. 1975).

On May 12, 1986, defendant and his employer Curtis Lilley were doing some remodeling work at the home of Roy and Wilma Jean Wolfinbarger, located on a rural route in Greene County. Roy Wolfinbarger owned a gold bracelet, a "diamond and ruby ring," and a "gold nugget ring," the three items of jewelry involved in the larceny. Wolfinbarger testified that the respective market values of the items were $1,500, $9,000, and $7,000.

Wolfinbarger kept the three items in the master bedroom. They were concealed "in a hollowed-out place on a leg of the dresser." That leg was located a foot or two from the doorway to the bathroom where Lilley and defendant were replacing some tile flooring. During the course of the afternoon of May 12, Lilley left the Wolfinbarger home to go to a tile shop and defendant remained there doing some clean-up work in the bathroom.

On May 14, 1986, Lilley and defendant, who both lived in Carthage at least 60 miles from the Wolfinbarger home, completed the remodeling work.

On Sunday, May 18, Wolfinbarger, who intended to wear the three items of jewelry that day, discovered that they were missing. He telephoned Lilley and told Lilley that the jewelry was missing. Lilley told Wolfinbarger that he had not taken the jewelry and that he would check with defendant. Lilley telephoned defendant. Lilley testified, "I gave him an hour, if he had that jewelry, to get it to my house. An hour later he showed up at my house with the jewelry." Lilley also testified that he was going to take the jewelry to Wolfinbarger but defendant told Lilley, "No, I took it, I'll take it back and apologize to the man myself."

Shortly after 2:00 p.m. that day defendant arrived at the Wolfinbarger home with the jewelry. Wolfinbarger and his wife Wilma Jean were there and so was deputy sheriff Jimmy Barber. Barber remained in another room but within earshot.

Mrs. Wolfinbarger said to defendant, "Do you mean you can come into our house and take anything out of our home and say you don't know who it belonged to." Defendant just shrugged his shoulders and said, "Uh-huh." Wolfinbarger asked defendant why he took the jewelry and defendant said that he had seen the jewelry and had always wanted nice jewelry like

that. "It was men's jewelry and if no one made a claim on it I would just keep it and wear it."

When the items were returned to Wolfinbarger the two rings were on the bracelet with the bracelet fastened. Defendant told Wolfinbarger that was the condition in which he found them. Wolfinbarger testified that the items were not "that way" when he had concealed them under the dresser.

Wolfinbarger also testified that he asked defendant why he had taken the jewelry and defendant said, "I didn't think it belonged to anybody." Wolfinbarger said, "Well, in my house you found it and you didn't think it belonged to anyone," and defendant said, "No." Both Wolfinbarger and his wife testified that defendant did not have permission to take the jewelry. Wolfinbarger asked defendant if he was going to keep the stolen items and defendant said, "Yes ... if no one had noticed them missing I was going to keep them."

Deputy Barber testified that he heard defendant say that he was sorry he had taken the rings and that the reason he had taken them was that he was not sure it was the Wolfinbarger's jewelry, that he had always wanted some gold jewelry like that and he had decided he would go ahead and keep it.

Defendant was taken into custody on May 18. The next day he gave a statement to detective Robert Alexander in which he said that on May 12 he had vacuumed the floor around the bathroom door and found the jewelry when he went outdoors to empty the cleaner's trash bag. Defendant said he put the jewelry in his pocket and went back inside the house and continued to work. Defendant told Alexander that two days later he went back and worked at the Wolfinbarger home. Alexander asked defendant if he had mentioned the matter to anyone and defendant said he did not mention it to anyone and no one mentioned it to him while he was working there.

Testifying in his own behalf, defendant said that he did not intend to steal the jewelry. He said that when he found the three pieces of jewelry in the trash bag, "I grabbed all three pieces and stuck it in my pocket and went ahead with my work just like normal. I didn't say anything to Mrs. Wolfinbarger. By the time Lilley got back I got so involved with working I didn't think anything of it. After I got home on [May 12] I put the jewelry on the dresser. On [May 18] I told Lilley when I was working the other day I sucked it up. It just escaped my mind because it's not too hard to put something in your pocket and forget about it." Defendant also testified that on May 18, when the jewelry was returned, "The Wolfinbargers got mad and lectured me and ate me out and used curse words and I sat there and took it. They accused me of stealing the jewelry."

Referring to defendant's testimony that he had found the jewelry when he emptied the trash bag, defendant's attorney asked, "Why didn't you at that point go back and wave it around and say, 'Look what I found,' or words to that effect." Defendant's answer was, "Well, when I was working, you know, and picked it up, I just ... like I said, I just stuck it in my pocket. I get my work done first and worry about everything else later."

Defendant also testified that on May 18 he told the Wolfinbargers, "Well, I didn't take it out of your house, I found it in the vacuum cleaner. I didn't know whether it was yours or Lilley's, because Lilley is a pretty wealthy man himself, he's got a nice house and everything and I've seen him with gold jewelry also."

He also testified that the Wolfinbargers "didn't claim it on Wednesday. Nobody said anything about it so I didn't think about telling that I had found it.... When I took it out of my pocket and laid it on my dresser I didn't think about having it, not a bit.... I live with my mother and I did not tell her that I found the rings or bracelet. I was hoping the right owner would get, you know, I would get word of it and return it. It should not have been lying on the floor to begin with, it's too expensive. Whoever lost it, I was hoping they would find it. If Lilley had not asked me if I had it, chances are it would still be lying up on the dresser today."

Mrs. Wolfinbarger testified that the hose to the vacuum cleaner "would not go under the edge of the dresser where the jewelry was" and she did not think the jewelry would have been sucked up by the cleaner. Wolfinbarger testified that the three items were fastened together when he recovered them and he did not believe the vacuum cleaner would suck up all three of them.

Defendant argues that his discovery of the jewelry was "inadvertent" and that there was no evidence that he intended "to permanently deprive the Wolfinbargers of their jewelry." Defendant also argues that as soon as someone did claim the jewelry he returned it, that he insisted on returning the jewelry to the Wolfinbargers instead of letting Lilley do so, and that he found the jewelry "in the vacuum" and "absentmindedly or not put [it] into my pocket and forgot about it until reminded of its existence on May 18."

Defendant's arguments overlook the fact that the jury was free to ignore his self-serving testimony that he found the jewelry in the trash bag. The evidence permits a finding that defendant found the three items in the cache and took them to his home where they remained for several days until his employer Lilley made the inquiry which prompted their return. The items were valuable and there was evidence that defendant was well aware of their value, which far exceeded the statutory requirement of $150. These factors invalidate defendant's position.

Even if the jury believed defendant's evidence concerning finding the jewelry in the trash bag, it was a permissible inference that, in view of their value, no one had intentionally discarded them. The jury could properly find that defendant's return of the jewelry to the rightful owner was involuntary and induced by the hope of avoiding prosecution.

This court holds that the evidence was sufficient to support a finding that defendant appropriated the jewelry with the purpose of depriving the owner thereof and without the owner's consent.

Defendant's point has no merit.

The judgment is affirmed.

HOGAN, MAUS and PREWITT, JJ., concur.