**STATE of Missouri, Respondent,**

v.

**Cecil Elmer FLOYD, Appellant.**

**No. 49038.**

Supreme Court of Missouri,

Division No. 2.

Oct. 8, 1962.

Robert F. Sevier, Liberty, S. Richard Pratt, North Kansas City, Johnson Story, Cameron, for appellant.

Thomas F. Eagleton, Atty. Gen., Joseph G. Stewart, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

BARRETT, Commissioner.

Upon a charge of murder in the first degree while "attempting to perpetrate rape" upon his granddaughter, Joann, age 13, Cecil E. Floyd, age 65, has been found guilty of manslaughter and his punishment fixed at ten years' imprisonment.

About 8 o'clock on May 27, 1960, Joann disappeared from her home on North Main Street and on June 7 her decomposed body was found in a rather secluded area known as Scott's Addition on the outskirts of Excelsior Springs. Joann and her family had formerly lived in Scott's Addition and her body was found by a search party of which Floyd was a member if not the organizer. Since the conviction is to be reversed and the cause remanded because of the admission in evidence of a photograph it is not necessary to detail the circumstances relied upon by the state, it is sufficient to say that there was no attempt on the part of the state to submit the charge of attempt to rape.

Initially Joann's body was identified by her brother, Edward, he did not claim to recognize her features, his identification was from her wristwatch, bracelet, shoes and her "rotted" red dress. At the outset of the trial defendant's counsel made the admission that the body found in Scott's Addition was Joann so the state would not be required to make "proof of identification." The limitation on the admission was "We are not agreeing we had anything to do with the death, simply agreeing that is the body." Edward, as did other witnesses, described the body, its location and position in detail, particularly the fact that the brush and weeds around the body were all "mashed" down. Incidentally, after the body was removed there were several photographs of the area and these too were offered and received in evidence without objection. Edward first described the body and the area without reference to photographs and then, as other witnesses did subsequently, identified or described the body and the scene after looking at exhibit one which was not offered in evidence until one of the state's principal witnesses, a deputy sheriff, testified. Exhibit one is a photograph of a decomposed body, admittedly the body of Joann. Edward and all of the state's witnesses, eight or nine in number, described the location of the body as being in the weeds and grass on the side of a hill and alongside a path. They all agreed that the head was to the east, the feet to the west and that her dress was pulled up around the waist and there were no panties or underclothes. The body was on its back, the legs apart, the right foot under the left knee.

Aside from the photograph itself the body and the photograph were best described by the coroner, a doctor of thirty years' experience. It was he who sent the body to a pathologist. These were the pertinent questions and answers on direct examination:

"A. The body that I saw was a dead body.

"Q. And could you tell the Court and Jury the state of the body?

"A. The body was badly decomposed. In fact, a lot of the tissue was completely gone, and the skull itself was—I touched the skull with my foot and it rolled away from the body, it was that badly decomposed.

"Q. In your opinion from examination of the body, could you determine the cause of death?

"A. No, sir.

"Q. Would it be possible to determine the cause of death?

"A. I don't think so.

"Q. For what reason?

"A. The body was too badly decomposed. There wasn't enough tissue left to determine the cause of death. Most of the organs were gone, and there was not any evidence of broken bones or bullets in the body from the

x-ray by the pathologist, and so far as I know, no determination could have been made.

"Q. Would it be possible for you to determine whether or not JoAnn * * * had been suffocated (the state's theory of her death)?

"A. No, sir.

"Q. It wouldn't have been possible for you to determine that?

"A. No, sir, not unless some of the bones had been fractured.

"Q. Are you testifying it was impossible for you to, at that time, or any time, to determine the cause of death?

"A. Yes, sir.

"Q. Because of the decomposition of the body?

"A. Yes, sir.

*     *     *     *     *

"Q. By cause of death, you mean whether or not it was by natural or unnatural means?

"A. Yes, sir.

"Q. And you likewise could not determine that there had been any attempt or any rape of this girl's body?

"A. No, sir."

After nine of the state's witnesses had testified, several of them being members of the search party, and had described the position and location of the body, some of them from looking at the photograph, the state for the first time offered exhibit one in evidence in the course of the testimony of a deputy sheriff. Defendant's counsel objected to the introduction of this particular photograph, stating and giving as reasons that the state's witnesses had testified specifically "to the location of the body, its appearance, and even to the location of the arms and legs, and this exhibit couldn't serve any purpose other than to inflame the jury and prejudice the jury against this defendant, and there has been no showing in addition thereto, that this defendant had any connection with the death of this girl." This objection was made out of the hearing of the jury and following the objection there was a lengthy colloquy between court and counsel. In the course of the discussion state's counsel described the exhibit as "a somewhat hideous photograph" and frankly said, "It is inflammatory." But the prosecuting attorney said, "We planned this in advance Judge, and we feel that now is the time to present it. * * * We want to show how badly the body is decomposed and the condition of the body * * *." State's counsel made this admission to the court, "We cannot prove the cause of death," but counsel urged that the photograph "shows the state of the decomposed body, and the reason to show that is that it is impossible—there is no pathological proof of any cause of death."

■■■ It is not necessary to consider in detail the rationale of photographs as evidence, it is sufficient to note that generally a photograph is "a superior substitute for words," and yet for evidentiary purposes is "simply *nothing, except so far as it has a human being's credit to support it*" and it must of course be "associated with a testifier." 3 Wigmore, Evidence, § 790, p. 174; annotation 159 A.L.R. 1413; Baustian v. Young, 152 Mo. 317, 324, 53 S.W. 921. And generally it may be said that photographs, colored (annotation 53 A.L.R. 2d 1102) or so-called black and white, of corpses of the victims of homicides or of various parts of their bodies are admissible in evidence for several purposes, "such as showing the nature and location of the wounds or the position of the body, as well as to corroborate the prosecution's theory as to the motive prompting the infliction of the lethal blow or to refute defendant's plea of self-defense, to prove the identity of deceased, etc." Annotations 159 A.L.R. 1413, 1414; 73 A.L.R.2d 769. These and other reasons or purposes for which photographs of corpses, even of de-

composed bodies, are often properly received in evidence are enumerated in the annotations which list the illustrative Missouri cases. If the photographs illustrate any of these purposes and also meet the tests of relevancy and probative force their admissibility is said to be within the discretion of the trial court and it is not a completely valid objection that they are gruesome, or are merely cumulative or corroborative of the testimony of the witnesses. State v. Moore, (Mo.) 303 S.W.2d 60, 65; State v. Brown, (Mo.) 312 S.W.2d 818. There are, however, limitations and qualifications on the court's discretion and the admissibility of such photographs, there may nevertheless be an objection to the relevancy of the fact shown or the prejudicial effect of the photograph may outweigh its probative value. McCormick, Evidence, § 152, p. 315; 3 Wigmore, Evidence, § 792, pp. 184–185; 23 C.J.S. Criminal Law § 852(1) c p. 353; State v. Moore, supra. The qualifications on the admissibility of such evidence are succinctly stated by the annotator, "such photographs should not be admitted where their sole purpose is to arouse the emotions of the jury and to prejudice the defendant, * * * the sound governing principle is that photographs which are calculated to arouse the sympathies or prejudices of the jury are properly excluded if they are entirely irrelevant or not substantially necessary to show material facts or conditions * * *." 73 A.L.R.2d, 1. c. 802.

■ The photograph objected to here, exhibit one, was neither needed nor offered for any of the conventional reasons or purposes,—to identify the victim, to show the nature and location of the injury, to illustrate or prove the character of the weapon, the surrounding circumstances, to determine the degree of the crime, or to show the cause of death. As a matter of fact, by the state's admissions, the body was in such a state of decomposition that most of these matters could not be found or illustrated, particularly by this photograph. In short, as the court said of another photograph in reversing a manslaughter conviction, this exhibit is "extremely obscene, offensive, vulgar, horrid, and repulsive" (State v. Robinson, (Mo.) 328 S.W.2d 667, 671), and any relevant probative value it may have is far outweighed by the fact that it is needlessly and manifestly inflammatory and therefore prejudicially erroneous. See also State v. Baldwin, 317 Mo. 759, 297 S.W. 10. For the reason indicated the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All of the Judges concur.