STATE of Missouri, Plaintiff-Respondent,

v.

**Chyral Lynn PINKUS, Defendant-Appellant.**

No. 9972.

Missouri Court of Appeals, Springfield District.

March 29, 1977.

Motion for Rehearing or Transfer Denied April 29, 1977.

Application to Transfer Denied June 14, 1977.

James W. Newberry, Springfield, for defendant-appellant.

John C. Danforth, Atty. Gen., Robert M. Sommers, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before HOGAN, P. J., FLANIGAN, J., and CAMPBELL and PYLE, Special Judges.

HOGAN, Presiding Judge.

About 9:00 p. m. on August 26, 1974, Emmanuel Ernest Spickard was discovered lying on a parking lot in the City of Springfield, Missouri. He had been fatally stabbed. By amended information filed December 9, 1974, defendant Chyral Lynn Pinkus was charged with homicide committed during the attempted perpetration of a robbery, an offense then denounced as first-degree murder by former § 559.010, RSMo 1969.[1] Upon trial to a jury in the Circuit Court of Greene County, defendant was found guilty and her punishment was fixed at life imprisonment. She appeals.

Defendant, 24 years of age at trial time, lived at Billings, Missouri, with her three-year-old daughter and one Bob Harris, an unemployed bricklayer. During the evening of August 26, defendant, her daughter and Harris drove to a parking lot adjacent to the Battlefield Lanes, a bowling alley located in south Springfield. Defendant was armed with a Government Issue M-6 bayonet. The M-6 bayonet has a tapered knife blade 6½" long, ⅞" wide at the base. It is milled from ³⁄₁₆" steel. Defendant's evidence was that she carried this weapon, tucked in her boot, as a means of self-protection.

Two versions of the operative facts were given, one by Harris, testifying as an immunity witness, the other by the defendant. Harris testified that he and defendant were "just drivin' around", and about 9:00 p. m. they went to the Battlefield Lanes to see if Harris' ex-wife was still employed there. Harris was sitting on the right—the "passenger seat"—holding defendant's child, who was asleep. Harris testified, without objection, that defendant stopped her automobile, said "she was going to rip someone off" and got out of the car. Defendant then "just wandered off" on the parking lot; two or three minutes later, Harris saw the defendant "off to [his] left", fighting with Spickard. Harris saw Spickard

"throw [defendant] on the ground by her hair", became angry, and got out of the car. Harris heard no outcry but was afraid Spickard "was going to hurt" the defendant. Spickard "swung at [Harris] and missed [him] and he swung at [him] again and hit [Harris] in the head and tore [Harris'] shirt off . . . so [Harris] hit him." Spickard fell to the ground and Harris ran back to defendant's car. Harris did not intend to take Spickard's wallet, but the defendant told him to go back and get it, and he did so.

Harris further testified that he saw no knife while he was fighting with Spickard. After he and defendant left the parking lot, however, defendant complained that she had been injured, and "finally [defendant] told [Harris] she went up behind the man, stabbed him in the back." Defendant handed Harris the bayonet; Harris "dropped it on the floor." Later, at the defendant's house, defendant boasted that she had stabbed Spickard "for the hell of it", stating that "it was a good clean drive, [defendant] didn't hit any bones." Defendant further stated "she ran it all the way to the handle." Harris and defendant divided the contents of Spickard's wallet—$41.00.

Defendant's account of the killing was that she had driven onto the Battlefield Lanes parking lot to determine what time it was because her clock was not working properly. Defendant left the automobile to relieve herself on the parking lot. Shortly after returning she saw a man coming in the general direction of her automobile; Harris asked her to get out to inquire what time it was. Defendant approached Spickard, Spickard asked defendant, "What do you want?", and defendant asked, "Do you have the time?" Spickard told defendant, "It's 9 o'clock." Spickard then turned and saw Harris sitting in the car a short distance away. Defendant's testimony was that Spickard thereupon asked defendant what she wanted, grabbed her by the hair,

1. The statute read, in pertinent part: "[E]very homicide which shall be committed in the perpetration or *attempt to perpetrate* any ar-

son, rape, *robbery*, burglary or mayhem shall be deemed murder in the first degree." (Emphasis added)

and threw her to the ground. Defendant tried to arise twice, but each time Spickard "threw [defendant] down again by the hair." Spickard then pushed defendant to the pavement and fell on top of her; then, according to the defendant, Spickard began beating her head "sideways" across the asphalt. Defendant's bayonet fell out of her boot; she raised her right arm over Spickard's body and made "a downward stroke" with the bayonet. Spickard then arose, telling defendant if she did "that again" he would kill her. Harris then came to defendant's aid and struck Spickard. Harris then said, "Let's get the hell out of here." Defendant took the bayonet back to the car, and Harris threw it on the floorboard. Defendant denied that she had said she intended to "rip somebody off", and denied she had said she drove the bayonet "all the way in to the handle."

The State had evidence establishing the crime in retrospect, so to speak. An autopsy was performed on the victim's body on August 27. The autopsy surgeon testified that he found four external wounds, one at the outside of the left eye, one through the left ear lobe, one through the tragus of the left ear and another, similar wound inside the external ear. All four wounds were about ⅘" long; all penetrated to the bone. All were, in the surgeon's opinion, inflicted by a sharp knife of some sort. The victim also had a split upper right lip. There were scraping wounds on the right elbow and right ankle indicating a fall to the pavement. The autopsy also disclosed one transverse wound, 2" wide inflicted between the 6th and 7th ribs on the right side of the victim's back. Upon dissection, the wound was found to be five to six inches deep. Further dissection showed a laceration of the right lung at the junction of the upper and middle lobes, including a laceration of the right pulmonary artery. The right chest was full of partially liquid and partially clotted blood. The autopsy surgeon testified without objection that in his opinion the victim's back wound had been inflicted at a right angle; that the fatal instrument had been moved laterally in the victim's body, and that massive hemorrhage from the pulmonary artery was the cause of the victim's death. Further, this physician's opinion was that the type of wound he found would induce shock from blood loss within five minutes and would be fatal within 30 minutes. He further noted that the fatal instrument passed through no bone or cartilage.

From the testimony of the victim's personal physician, it was established that he was 81 years of age at the time of his death, that he was 5'6¾" tall and weighed about 140 pounds. Both physicians indicated the victim appeared to be in good health, considering his advanced age. Other facts will be noted, as material, in the course of this opinion.

▆ Defendant's counsel on appeal has meticulously briefed and argued 13 assignments of error. Some of the contentions made are extremely strained and tenuous, for example, defendant's argument that venireman Richard D. Marlin should not have been stricken for cause. The record indicates, in point of fact, that venireman Marlin approached the bench following voir dire examination and indicated that because of previous drug abuse he had difficulty concentrating, had "visions", and in general "felt sorry for people" because he "had a pretty rough life, too." The court, as indicated, excused Marlin for cause. Manifestly, defendant had no right to be tried by an incompetent juror, and the point is patently without merit. A good many other allegations of error of the same order of merit are advanced, obviously because counsel recognizes that defendant's appeal to this court is her appeal of right. *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). We commend counsel for his thoroughgoing discharge of his duty to present and argue every point which can be presented without compromising professional standards, see *State v. Gates*, 466 S.W.2d 681, 683 (Mo.1971); *State v. Barnes*, 517 S.W.2d 155, 167–170 (Mo.App.1974), but it does not follow that we must recite and discuss each point advanced. The record

has been three times read and twice abstracted in this court, the defendant's claims of error have been fairly presented, and we confine our discussion to those arguments which merit serious consideration.

■ The first of these is defendant's argument that the trial court erred in admitting the bayonet, the victim's wallet, several items of clothing and two briefcases in evidence, because these items were seized pursuant to an unlawful search. The defendant admittedly consented to the search in writing, and the only issue here is whether her consent was voluntarily given or was the product of coercion. Defendant argues that her consent was not voluntary because 1) at least one officer's weapon was exposed to view; 2) she was told that if she did not consent to the search, a search warrant would be obtained; 3) at least nine officers were present when she was taken in custody and the search was conducted, and 4) a so-called "confrontation" took place at defendant's mother's home.

The trial court held an extensive hearing on the defendant's motion to suppress. Contrary to the assumption made by both parties, no ruling was ever made on the motion, and when the demonstrative evidence now complained of was offered, trial counsel contented himself with remarking that he had no objection beyond those which he had already advanced. We doubt the point is preserved for review, see *State v. Young*, 534 S.W.2d 585, 588 (Mo.App. 1976); *State v. Ealey*, 519 S.W.2d 314, 320 (Mo.App.1975), but because defendant insists her constitutional rights were infringed, we prefer to notice it.

To determine whether a criminal defendant has voluntarily consented to a search, a court looks to the "totality of all the circumstances", *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 863 (1973), which means, we suppose, that the presence or absence of persuasion or compulsion is always subjective. *State v. Witherspoon*, 460 S.W.2d 281, 288–289 (Mo.1970)· *State v. Rush*, 497 S.W.2d 213, 215 (Mo.App.1973). Factors to be considered are the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether there was any fraud on the part of the officers, the acts and statements of the person giving consent, and other matters comprising the so-called "totality of the circumstances". *State v. Berry*, 526 S.W.2d 92, 98 (Mo.App. 1975); *State v. Rush*, supra, 497 S.W.2d at 215.

The defendant claims that at least one officer's weapon was exposed; this, she says, was a coercive factor. The record discloses that the arresting officers were armed, but defendant's own testimony was that no weapons were displayed. The fact that the officers were carrying sidearms does not constitute coercion in the absence of a display of those weapons. *State v. Berry*, supra, 526 S.W.2d at 99· cf. *Drummond v. United States*, 350 F.2d 983, 988–989[5] (8th Cir. 1965), cert. denied, *Castaldi v. United States*, 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542 (1966). Defendant also complains that nine officers were present at her house when the search was conducted. The number of officers present is one factor bearing on the existence of coercion, *State v. Rush*, supra, 497 S.W.2d at 215, but this factor alone is not determinative, and the presence of a group of officers upon the premises, without more, does not render her consent involuntary. *United States v. Peterson*, 524 F.2d 167, 178 (4th Cir. 1975), cert. denied, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976), and 424 U.S. 925, 96 S.Ct. 1136, 47 L.Ed.2d 334 (1976). The defendant's argument concerning a "confrontation" is no more convincing. What the record shows is that the defendant was allowed to consult her mother before authorizing the search. Defendant's mother stated that she had no objection to a search and saw no reason why defendant should object. The so-called "confrontation" in no sense indicates police coercion. Defendant now says she would not have consented if the arresting officers had not told her they would obtain a search warrant if she did not consent. The State produced evidence

that the defendant was told no such thing, and there is no evidence of any suggestion of dire consequences if defendant did not consent. In view of the evidentiary showing that defendant was advised by at least two officers that she was not obliged to consent, nor sign the written consent which was prepared, and in view of the fact that defendant was advised of her rights after she was taken in custody and before her premises were searched, the statement, if it was made, that a warrant would be obtained if she did not consent does not amount to coercion. Fairly read, the record shows 1) that defendant's consent was given at her home, "not in the confines of the police station", see *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598, 609 (1976); 2) that she had not been subjected to custodial interrogation and no threats were made; 3) the arresting officers did not undertake any show of force and did not emphasize their authority; 4) there was no evidence of any fraud or misleading on the part of the officers; 5) the defendant stated she wanted to give written consent after being advised she was not obliged to do so; 6) the defendant was alert and appeared to be aware of what she was doing; 7) the defendant was cooperative and voluntarily handed the murder weapon over to the officers present. Considering the "totality of the circumstances", the defendant's consent to the search was entirely voluntary.

■■■ Two further points argued by the defendant may be considered together. She argues that the trial court erred in receiving certain in-custody statements made by her prior to the time she confessed in writing, and that there was similar error in admitting a letter defendant wrote to Harris while she was in custody awaiting trial. Defendant does not seriously contend, nor could she, that the evidence complained of was not admissible; inculpatory statements of comparable tenor and effect were held properly admitted in evidence in *State v. Seals*, 515 S.W.2d 481, 484–485[1] (Mo.1974), and *State v. Spica*, 389 S.W.2d

35, 46–48[17], 49–50[20] (Mo.1965), cert. denied 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966). The whole substance of the two points raised is that the defendant was prejudiced because the oral statements and the letter received in evidence show that she uses the word "fuck" in various forms and contexts, as part of her usual vocabulary. The word complained of, according to the O.E.D., was "until recent times not often recorded in print but frequent in coarse speech". 1 Oxford English Dictionary 1170 (Supp.1972). As a verb, the word appeared in English as early as 1503, and is now, according to the O.E.D., in common coarse use as an adverb and participial adjective. Evidence otherwise admissible is not rendered inadmissible because it may tend to prejudice and inflame the jury against a defendant, *State v. Tillett*, 233 S.W.2d 690, 692[9] (Mo.1950), and the jury was entitled to hear and read this defendant's admissions as they were made, not after they had been expurgated to spare her character. *State v. Spica*, supra, 389 S.W.2d at 49–50[20]. The admission of defendant's inculpatory statements was not erroneous for the reason assigned.

■■■ A complaint of no greater import is that the trial court erred in failing to grant a mistrial because the State introduced evidence tending to prove defendant's involvement in other, unrelated crimes.

In the course of the search which we have discussed the arresting officers seized two briefcases. These briefcases were discovered to have been stolen. Defendant denied having taken them and professed ignorance of their presence in her house. During the trial, however, Harris was asked if he had "ever seen [defendant] steal before". Harris answered that he had, "several times". The State inquired further about these incidents and Harris testified—without objection—that he had seen the defendant steal the briefcases at two Springfield restaurants. Later, Officer Jared, one of the arresting officers, was questioned about the two briefcases; Jared stated, "they were

taken out of car burglaries approximately a week and a half or two weeks prior to the time we recovered them in [defendant's] home." At this point, defendant moved a mistrial. The trial court denied the motion, and counsel requested the jury be admonished to disregard Jared's testimony concerning the briefcases. The trial court did so. Having failed to raise this point in her motion for new trial, defendant asks us to consider it as plain error pursuant to Rule 27.20(c), V.A.M.R. We have done so, and find no plain error. Jared's testimony indicating the commission of other, unrelated offenses by the defendant was merely cumulative to other testimony received without objection, and the error, if any, is harmless. *State v. Burnside*, 527 S.W.2d 22, 25[5] (Mo.App.1975).

A further claim of error advanced by the defendant is that the trial court erred in admitting Exhibits 5, 15 and 16, which were photographs of the victim. Exhibit 5 is a black and white photograph of the victim lying on his back on an ambulance cot which has been set on an operating table. This photograph clearly shows the multiple stab wounds about the left side of the victim's head which were described by the autopsy surgeon. Exhibit 16 is a photograph of the victim on the same ambulance cot, showing the location of the fatal wound and indicating considerable hemorrhage from that wound. Exhibit 15 is a picture of the deceased upon an autopsy table. Taken with the testimony of the autopsy surgeon, as it was, Exhibit 15 clearly shows the severity of the wound which was the cause of death. Defendant's objection is particularly directed to Exhibit 5, which shows the head wounds; in fact, in her brief, the defendant concedes that "one and possibly two of these exhibits were admissible."

We find this claim of error without merit. We agree that a photograph of the victim in a homicide case may be so gruesome and inflammatory that its probative value is outweighed by the prejudicial effect it has on the jury. In such cases the photograph

or photographs should be excluded. *State v. Floyd*, 360 S.W.2d 630, 632–633[1–3] (Mo. 1962). What the defendant overlooks is that exhibits 5, 15 and 16 were offered and received for quite conventional purposes. Photographs are admissible to show the degree of the crime, *State v. Floyd*, supra, 360 S.W.2d at 633[4]; Annot., 73 A.L.R.2d 769, 831–832 (1960), and to refute the defendant's plea of self-defense. *State v. Aubuchon*, 394 S.W.2d 327, 331[5] (Mo.1965); *State v. Perkins*, 382 S.W.2d 701, 704–705[6,7] (Mo.1964); *State v. Floyd*, supra, 360 S.W.2d at 633[4]. In her confession and on the witness stand, defendant claimed she killed Spickard in an attempt to ward off an unprovoked attack. The State's position was that Spickard was deliberately killed. Taken as a group, the photographs show that the victim was subjected to a vicious attack with a knife and are thus relevant on the issue of malice; considered with the evidence that the victim was an 81-year-old man who weighed only 140 pounds, the photographs tend to negate defendant's plea of self-defense. The court did not err in admitting the photographs.

The defendant further argues that an instruction on circumstantial evidence should have been given. The State's case did not rest wholly on circumstantial evidence; part of its case, including defendant's admissions, was direct and the trial court did not err in refusing the requested instruction pertaining to circumstantial evidence. *State v. Stevens*, 467 S.W.2d 10, 25[23–25], 50 A.L.R.3d 96, 115 (Mo.1971), cert. denied, 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971).

Defendant further asserts that the trial court erred in refusing to grant her a new trial because of newly discovered evidence. This point was first raised in defendant's amended motion for new trial, which was timely filed. Evidence was heard on the motion. The substance of the evidence received from four witnesses, three of whom were inmates of the Missouri State Penitentiary, was that during his

confinement in the Greene County Jail, Harris confessed that he, not defendant, struck the fatal blow. Defendant testified, but her testimony is not such as to absolve her from active participation in the crime. She was present, she was in possession of the bayonet, and she stated positively that she "just swung" at the victim with the bayonet. The trial court rejected defendant's evidence on the motion for new trial on the grounds 1) that it was not credible and not worthy of belief, and 2) that the testimony only affected Harris' credibility as a witness and therefore was not sufficient to warrant a new trial.

The trial court acted well within its discretion in denying the motion for new trial upon the grounds stated; there was no actual recanting testimony, and the trial court was not obliged to accept the defendant's evidence at face value. *State v. Harris*, 428 S.W.2d 497 (Mo.1968). The real difficulty with defendant's position regarding a new trial, however, is that in order to obtain a new trial on the basis of newly discovered evidence, a criminal defendant must show that the newly discovered evidence would probably produce a different result on a new trial, *State v. Harris*, 413 S.W.2d 244, 247 (Mo.1967); *State v. Stroud*, 362 Mo. 124, 127–128, 240 S.W.2d 111, 113[5] (Mo.1951); *Duncan v. State*, 520 S.W.2d 123, 125[4] (Mo.App.1975), and no such showing was made here. The most that was shown is that defendant and Harris were unsure who had inflicted the fatal wound. The distinction between principals and accessories has been abrogated in this state, § 556.170, RSMo 1969, all persons who participate in a crime may be charged, tried, convicted and punished alike, *State v. West*, 484 S.W.2d 191, 195 (Mo.1972), defendant's presence and participation were not denied upon the motion for new trial, and it is immaterial whose hand struck the very blow which took Spickard's life. *State v. Tolias*, 326 S.W.2d 329, 333–334 (Mo. 1959); *State v. Chernick*, 278 S.W.2d 741, 746 (Mo.1955).

 The final two points for consideration are a) the sufficiency of the information, and b) the sufficiency of the evidence to support the verdict of the jury. Read as a whole, the amended information charged that defendant, on August 26, 1974, did "wilfully, unlawfully and feloniously deliberately, premeditatedly and of her malice aforethought cause the death of Emmanuel Ernest Spickard by striking him and stabbing him with a bayonet, during the commission of a felony, to-wit: attempted robbery, from which wounds the said Emmanuel Ernest Spickart [sic] did die . . . ." The information is not artfully drawn, but it charges that the defendant inflicted a wound from which the victim died, and includes allegations of deliberation, premeditation and malice. The information is sufficient to charge murder in the first degree. *State v. Harley*, 543 S.W.2d 288, 292[5,6] (Mo.App.1976); *State v. Kerr*, 531 S.W.2d 536, 539[1,2], [3] (Mo.App.1975). The conclusional averment that the murder was committed during the commission of an attempted robbery may and should be disregarded as surplusage. *State v. Meyers*, 99 Mo. 107, 114, 12 S.W. 516, 517 (1889); *State v. Harley*, supra, 543 S.W.2d at 292[6].

 The sufficiency of the evidence is not seriously challenged. The defendant admitted stabbing the victim; she maintained she did so in self-defense, but of course the jury was not bound by that explanation. The jurors were entitled to accept or reject any part of her admission or her testimony. *State v. Deyo*, 358 S.W.2d 816, 822[9] (Mo.1962). Given the general propositions that the effects of conflicts or inconsistencies in any testimony are questions for the jury, *State v. Turnbough*, 497 S.W.2d 856, 858[5] (Mo.App.1973), and that a jury may believe all or none of the testimony of a witness, or accept it in part or reject it in part, just as they may find it to be true or false when considered in relation to other testimony and the facts and circumstances of the case, *State v. Wynn*, 391 S.W.2d 245, 247[1] (Mo.1965); *State v. Berry*, supra, 526 S.W.2d at 95[5], the jury in this case could find either that the defendant killed Spickard in self-defense, or

that she wantonly took his life while attempting to rob him of $41. By their verdict, they chose the latter alternative, and their verdict is amply supported by the evidence. Accordingly, the judgment is affirmed.

All concur.

## ON ALTERNATIVE MOTION FOR REHEARING OR TO TRANSFER TO SUPREME COURT

PER CURIAM.

 The defendant has timely filed an alternative motion for rehearing or to transfer the appeal to the Supreme Court, pursuant to Rule 84.17, V.A.M.R. Defendant asserts: 1) that this court overlooked a material matter of fact and law in failing to consider her 12th assignment of error, specifically that the trial court erred in refusing to permit her to introduce the testimony of Dr. George Parlato, a practicing psychiatrist; 2) that this court erred in holding that defendant's consent to the search of her dwelling was made voluntarily, and 3) that this court erred in holding there was no prejudicial error in permitting the State to introduce evidence tending to implicate the defendant in the commission of other, unrelated offenses. Points two and three are mere rearguments of issues determined by the principal opinion; they must be disregarded. Rule 84.17, V.A.M.R. Point one was not overlooked by this court; our conclusions were simply not articulated in the principal opinion. We concluded there was no merit in assignment of error number 12, and perhaps, again in view of the fact that defendant has received a life sentence and this is her appeal of constitutional right, we should address defendant's claim of error on this motion for rehearing. We note that this assignment of error was not preserved in the motion for new trial; it is before us only as a possible matter of plain error under Rule 27.20(c), V.A.M.R.

 It was developed during the trial that Harris, at the request of his counsel, was examined by Dr. George Parlato, a practicing psychiatrist, to determine whether he was competent to stand trial. Upon cross-examination, Harris was asked if he had had psychiatric examination and treatment; he responded that he had. Later, and before the defendant testified, her counsel asked to call Dr. Parlato as a witness. Defendant's trial counsel indicated that Dr. Parlato would testify that Harris had a tendency to become "extremely tense and agitated" in situations involving physical violence, and would further testify that Harris placed his own conduct in as favorable a light as possible. The State objected on the ground that such testimony would introduce a collateral issue, and upon the ground that "this doctor has only seen this young man one time." The court inquired whether defendant's counsel based his offer on Dr. Parlato's report; counsel answered "yes". The court asked about a particular sentence which read: "[Harris] was quite persistent in disclaiming any knowledge of [defendant's] intention to rip somebody off in regards to the instant offense. He tries to place himself in as favorable a light as possible. For instance, he offered me a cigarette when talking about Chyral's alleged activities." Counsel stated he would offer the whole sentence, except the part about cigarettes. The State objected on the ground that Dr. Parlato's testimony would not constitute "direct evidence of [Harris'] reputation for truth and veracity." Counsel for Harris, who was present, objected to the introduction of any evidence based on Dr. Parlato's examination because any statements made by Harris would be privileged by the operation of § 552.020, para. 9, RSMo Supp. 1975. Without specifying its reason, the trial court refused to allow the defendant to call Dr. Parlato. Defendant now suggests that denying her the benefit of Dr. Parlato's testimony amounted to a manifest injustice.

The real difficulty with this point, and the reason it was not specifically discussed in the principal opinion is that defendant's argument has far outrun the record. Apparently Dr. Parlato's examination and re-

port were made pursuant to § 552.020, RSMo Supp. 1975, and apparently that report was before the trial court but it is not before us, sealed, under protective order or otherwise. Perhaps it is possible in the arcane world of modern psychiatry to determine whether or not a person is a sociopathic or pathological liar in one examination, but this record does not demonstrate that Dr. Parlato arrived at any such conclusion. We will concede that the existence of mental derangement may be shown to discredit a witness provided it affected the witness at the time of the incident testified to, or while he is on the stand or in the meantime so as to cripple his powers of recollection. 3A J. Wigmore, Evidence § 932 (Chadbourn rev. 1970), and see *United States v. Hiss*, 88 F.Supp. 559, 560[2] (D.C.N.Y.1950); *Fries v. Berberich*, 177 S.W.2d 640, 643–644[8–10][11–13] (Mo.App.1944). It should appear clearly, however, that the expert's observation of the witness was sufficient for the expert to form a reasonably certain opinion, Annot., 20 A.L.R.3d 684, 697–698 (1968), and no such showing was made here. In any event, and quite apart from questions of privilege,[2] we believe the admission of such expert testimony is a matter resting in the discretion of the trial judge, and we find no abuse of that discretion, much less manifest injustice in this case. *United States v. Barnard*, 490 F.2d 907, 912–913[11–14] (9th Cir. 1973), cert. denied 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974).

The motion for rehearing is denied; the motion to transfer to the Supreme Court is denied.

2. We are inclined to think the privilege conferred by § 552.020, para. 9, may be more extensive and complex than defendant argues, see, e. g., *United States v. Alvarez*, 519 F.2d 1036 (3d Cir. 1975), (construing 18 U.S.C. § 4244, from which the language of § 552.020 is in part taken), but we do not here examine the question of privilege.