**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**David Lee SEMPSROTT,**
**Defendant-Appellant.**

**No. 40292.**

Missouri Court of Appeals,
Eastern District,
Division One.

Sept. 11, 1979.

---

Whitney & Burnet, James W. Whitney, Clayton, for defendant-appellant.

John F. White, Asst. Pros. Atty., Clayton, John D. Ashcroft, Atty. Gen., Steven D. Steinhilber, Asst. Atty. Gen., Paul Robert Otto, Chief Counsel, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Judge.

Defendant appeals from a jury conviction of two counts of murder in the first degree and one count of murder in the second degree. The court, finding the Second Offender Act applicable, assessed punishment to be life imprisonment for each of the offenses.

Defendant does not contest the substantiality of the evidence in supporting the verdict and judgment. Consequently we shall only generally state the evidence introduced.

The evidence shows that defendant, David Lee Sempsrott, abused a variety of drugs for five years prior to conviction in the immediate action. Early in this period of drug abuse defendant befriended Donald Chronister. These two men developed a close friendship which centered around drugs. Usually, one of these two men would secure a quantity of marijuana, tetrahydracannabinol (THC, an artificial derivative of marijuana), lysergic acid diethylamide (LSD), or amphetamines and share it with or sell it to the other. It was not uncommon for these two men to ingest a large amount of these drugs, or any other narcotic they could find, on a daily basis.

During the evening of January 10, 1977, defendant borrowed a car and drove to Troy, Missouri, where his friend John Arnell lived. Before departing defendant smoked a number of marijuana cigarettes and ingested a quantity of THC. Upon arriving at the Arnell residence defendant asked John if he would sell him a gun. Mr. Arnell, who lived with his wife and son, proceeded with defendant to a bedroom where they could speak in private. As Arnell passed defendant, on the way to the bedroom, defendant hit him on the head with a .22 caliber pistol. Apparently, defendant concealed the weapon until he made the assault. Defendant bought the weapon the day before for $35 from a man he met in the parking lot of a fast food restaurant. Arnell, who was heavier and larger than defendant, responded to defendant's blow by knocking the gun out of defendant's hand. Arnell then seized the gun and unloaded the chamber.

Defendant's violent conduct was neither provoked nor the product of ill feeling. Immediately following the incident defendant told John he was just playing, he had dropped the gun and that he had not intended to strike his friend. At trial defendant could offer no explanation for his conduct. John Arnell described defendant as being "messed up on dope" and having a wild look on his face immediately following the incident. After the defendant became somewhat calm the two men moved into the kitchen where they conversed, played cards and drank coffee. Eventually Arnell returned the unloaded gun to the defendant. At around 10:45 p. m., the defendant departed in the borrowed automobile.

The defendant drove from the Arnell residence to Overland, where his friend Donald Chronister lived. Mr. Chronister shared an apartment with Mary Ann Blair and with Mary Ann's four year old daughter from a previous marriage, Angela Blair. Defendant arrived at about 1:00 a. m. Although Chronister was somewhat annoyed by defendant's late night visit, Chronister admitted defendant. The defendant entered the

apartment with the pistol, now reloaded, hidden under his coat. Chronister invited defendant to take a seat at the kitchen table. The two men began to play cards and smoke marijuana. After playing a few hands Chronister rose to get two cold drinks from the refrigerator. The defendant followed Chronister. As Chroinster neared the refrigerator the defendant struck him in the back of the head with the barrel of the pistol. When Chronister turned around defendant took a step back and shot him in the head and chest.

Upon hearing the gun shots Mary Ann Blair, who had been in the master bedroom preparing to go to sleep, ran into the kitchen. Defendant calmly told Mary Ann that he had shot Donald and that she and her daughter should be quiet. Defendant then instructed Mary Ann to gag and tie Angela. Ms. Blair returned to the master bedroom and bound her daughter with items of underclothing. Mary Ann was then ordered into the livingroom where she was similarly tied with underclothing. After both Mary Ann and Angela were securely bound the defendant took a seat on the livingroom couch. Mary Ann, wearing only a robe and nightgown, lay directly in front of where defendant sat. At some point defendant untied Mary Ann and ordered her to remove her robe. After defendant retied the woman he cut away her nightgown with a pair of scissors. At trial defendant explained he removed Mary Ann's clothing because if she were to loosen her bonds she would be less likely to escape. Mary Ann now lay naked on the livingroom floor. According to his own testimony, defendant sat on the couch for thirty-five to forty minutes. He then stood up, walked to the kitchen, put on a pair of gloves and picked up a large knife. Defendant walked back into the livingroom and stabbed Mary Ann thirteen times. During his attack Mary Ann freed her hands and tried to resist. Defendant responded by smashing the butt of the gun's handle to her forehead. When defendant was sure Mary Ann was dead he went into the bedroom where Angela lay asleep on her mother's bed. Defendant lifted the child from the bed and placed her on the floor. He then stabbed Angela in the throat and strangled her until dead.

After defendant finished he returned to the livingroom couch. Defendant sat there for thirty to forty-five minutes before he decided to leave the apartment. Prior to departing defendant collected whatever incriminating evidence he could find, including the gun, Mary Ann's robe and nightgown, the ashtrays he touched while smoking and the knife. Defendant also seized the watch from Chronister's wrist, the wallet from Chronister's back pocket and an unemployment check for $85 issued to Chronister. Defendant left the apartment carrying the above items, at approximately 3:00 a. m., January 11, 1977.

Defendant's first contention is that the trial court erred in admitting into evidence State's Exhibits Numbers 6, 7 and 8, which were photographs of the victims. These photographs, which show the victims' condition in gruesome detail, were taken some twenty hours after the murders had been committed. State's Exhibit Number 6 shows Donald Chronister with blood on his head and hands, slouched against the kitchen wall. State's Exhibit Number 7 illustrates Mary Ann Blair laying naked on the livingroom floor. Mary Ann's face, hands and upper torso are smeared with blood as is the carpeted floor on which she rests. Angela Blair is shown in State's Exhibit Number 8. A panty hose stocking is wrapped around Angela's bloody neck. Defendant argues that these photographs "did not throw any light on an issue before the jury," and the "sole purpose of producing the photographs was to inflame the jury" and that "non-prejudicial evidence had previously been admitted which made the photographs unnecessary." We do not agree.

The admissibility of photographs of dead bodies, a form of demonstrative evidence, lies within the sound discretion of the trial court. *State v. Robinson*, 328 S.W.2d 667 (Mo.1959); *State v. McClain*, 536 S.W.2d 45 (Mo.App.1976); *State v. Dodson*, 556 S.W.2d 938 (Mo.App.1977). Such evidence is admissible when its tendency to

prove a fact in issue outweighs its prejudicial effect. *State v. Dodson, supra,* at 947. Thus, when a defendant pleads not guilty to charges of murder in the first degree photographs are admissible if they: connect the accused with the crime, prove the identity of the deceased, show the position of the body, depict the location and nature of the wounds, tend to show the state of mind of the defendant, corroborate, explain or clarify the testimony of a witness or refute a defense unless the prejudicial effect is so great as to outweigh any possible probative values. *State v. Jones,* 515 S.W.2d 504 (Mo. 1974); *State v. Jackson,* 499 S.W.2d 467 (Mo.1973); *State v. Clark,* 494 S.W.2d 26 (Mo.1973); *State v. Stevens,* 467 S.W.2d 10 (Mo.1971); *State v. Floyd,* 360 S.W.2d 630 (Mo.1962); *State v. McDaniel,* 336 Mo. 656, 80 S.W.2d 185 (1935). Photographs are not made inadmissible because the content of the photo, the victim and scene of the crime, are described and illustrated by other evidence. To the contrary it is well settled that photographs are admissible when they enable the jury to better understand the facts. *State v. Thresher,* 350 S.W.2d 1 (Mo. 1961); *State v. Edwards,* 435 S.W.2d 1 (Mo. 1968). Nor are photographs with probative value rendered inadmissible solely because they present a gruesome sight. *State v. Moore,* 303 S.W.2d 60 (Mo.1957). "If photographic views are shocking, when presenting an accurate picture, it is because the crime is of that sort, whether described in words or pictures." *State v. Stevens, supra,* at 24.

■ The trial court did not abuse its discretion in admitting the photographs of the victims, State's Exhibits 6, 7 and 8. All three of the pictures identify the victims, show the position of the bodies as they were left by defendant, and corroborate, explain and clarify the testimony of witnesses, including the defendant. Further, defendant's primary defense was that he did not form the intent to murder. In ascertaining the existence of the requisite intent the jury could consider all the circumstances surrounding the incident out of which the charge arose. *State v. Woody,* 406 S.W.2d 659, 661–662 (Mo.1966). The photos help establish that defendant acted with the requisite intent because they show the victims condition following the event, the nature and location of the wounds and the immediate area in which the murders transpired.

Defendant's second contention is that the trial court erred by refusing to admit into evidence a letter written by defendant to Janet Chronister, sister of victim Donald Chronister. The evidence shows the letter was received by Ms. Chronister with a postmark of August 11, 1977. In the letter defendant expressed remorse for his actions and his inability to explain what happened the night of the murder. Defendant argues that the letter should have been admitted to prove his state of mind at the time of the incident. We do not agree.

■ Defendant's letter to Janet Chronister contained self-serving statements and was properly excluded. Declarations in defendant's own interest, not shown to have been made as part of the res gestae are properly excluded as self-serving. *State v. Gooch,* 420 S.W.2d 283, 289 (Mo.1967). In order for defendant's statements in the letter to be part of the res gestae they must be the apparently spontaneous result of the occurrence operating upon his perceptive senses. *State v. Stallings,* 334 Mo. 1, 64 S.W.2d 643 (1933). Declarations that are the product of reasoning from collateral facts are not part of the res gestae. *State v. O'Neal,* 436 S.W.2d 241, 244 (Mo.1968). The element of spontaneity is absent here. The record in no way indicates that defendant's letter was the spontaneous result of the murders operating upon his senses. To the contrary defendant wrote Janet Chronister seven months after the murders had been committed to apologize for killing her brother. The murders and the statements did not form one continuous transaction and the trial court committed no error in excluding this letter.

Defendant's third contention is that the trial court erred by prohibiting defense counsel from questioning the venire panel, during voir dire examination, concerning their willingness to follow the law as it

related to first degree murder. The record indicates that defense counsel informed the court that he intended to ask the members of the venire panel whether they could follow the law by assessing life imprisonment without parole for a minimum of 50 years, if they found defendant guilty of first degree murder. The prosecutor objected to this line of inquiry. The court responded that defense counsel could point out to the panel that murder in the first degree is punishable by a sentence of life imprisonment but no reference could be made to the eligibility of parole. In sum, defendant argues that he should have been able to inform the jury that he faced a minimum of 50 years imprisonment if convicted of first degree murder and sentenced to life imprisonment. We do not agree.

■ It is well settled that the examination of prospective jurors as to their ability to render an impartial verdict is conducted under the supervision of the trial court. *State v. Johnson*, 558 S.W.2d 284, 286 (Mo. App.1977). The trial court is vested with broad discretion in controlling this examination process and the appellate court will not interfere unless the record discloses a manifest abuse of that discretion. *State v. Mudgett*, 531 S.W.2d 275, 279 (Mo. banc 1975). Although there is no case precisely on point we are unable to hold that the trial court abused its discretion in prohibiting defense counsel from apprising the venire panel that a person found guilty of murder in the first degree and sentenced to life imprisonment would not be eligible for parole for a minimum of 50 years. In so holding we are guided by the rule that prohibits a prosecutor from calling the jury's attention, in oral argument, to the possibility that a defendant may be released from imprisonment by parole as a reason for imposing a greater penalty. *State v. Kaempfer*, 342 Mo. 1007, 119 S.W.2d 294, 296 (1938). Likewise, we are directed by the rules which forbid the court from instructing that the sentence imposed by the jury may be lessened or cannot be diminished by the executive branch. *State v. Rollins*, 449 S.W.2d 585, 591 (Mo.1978); *State v. Cornett*, 381 S.W.2d 878, 881 (Mo. banc 1964). Since a defendant may not successfully offer an instruction concerning the availability of parole we think it reasonable that he be barred from inquiry of prospective jurors whether they could impose a life sentence knowing that parole would be unavailable for a minimum of 50 years. "The question of future clemency is extraneous to a proper determination of issues of guilt and punishment by the jury. It should be of no concern to them." *State v. Rollins*, supra, at 591.

Moreover, the jury, after it found the defendant guilty, did not assess punishment in this case. The defendant was charged as a second offender. Therefore, the court, pursuant to the terms of § 556.280, RSMo. 1969, sentenced defendant. Because the jury only determined defendant's guilt no prejudicial error could have been committed by prohibiting defense counsel from inquiry of the jurors' ability to assess punishment.

Defendant's final assignment of error concerns the State's use of Dr. Joseph F. Shuman as a witness. The record shows that defendant called Dr. Robert B. Deitchman as an expert witness. Dr. Deitchman's testimony served as the basis for defendant's allegation that he did not form the requisite intent to commit first degree murder due to his diminished mental capacity. To contradict Dr. Deitchman's testimony the prosecutor called Dr. Shuman, a court appointed psychiatrist who had examined defendant, as a rebuttal witness. Defendant argues that Dr. Shuman's testimony should have been excluded because the prosecutor failed to disclose his intention to call Dr. Shuman as required by Rule 25.32.

■ Whatever the merits of defendant's contention may be, we are unable to review this issue. There is nothing in the record indicating either that defendant made a written request for discovery, or the state's response thereto. Defense counsel baldly asserts that he "properly made a request for discovery in compliance with Supreme Court Rule 25.32." But the transcript is absent of such a motion. Further the trial court made specific reference to defendant's failure to file a written request

for discovery with the court. "Rule 25.-32(a)(1) requires that the state shall, on *written* request of the defendant, disclose the 'names and last known addresses of persons whom the state intends to call as witnesses . . . .'" (Emphasis added). *State v. Curtis,* 544 S.W.2d 580, 582 (Mo. banc 1976). Since defendant failed to make a written request for discovery the state's duty to disclose did not arise. *State v. Curtis, supra.* Further, if such a motion was in fact made there is nothing in the transcript indicating the ruling of the trial court. Because defendant failed to prepare and file a record incorporating the basis for the alleged error, there is nothing for this court to review. *State v. McCoy,* 559 S.W.2d 298, 300 (Mo.App.1977). Judgment affirmed.

SNYDER, P. J., and WEIER, C. J., concur.