**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Ronnie RANDOLPH,
Defendant-Appellant.**

**No. 51793.**

Missouri Court of Appeals,
Eastern District,
Division Two.

March 24, 1987.

Motion for Rehearing and/or Transfer
Denied May 6, 1987.

Application to Transfer Denied
June 16, 1987.

REINHARD, Judge.

Defendant was convicted by a jury of capital murder and sentenced to a term of life imprisonment without eligibility for probation or parole until he has served a minimum of fifty years. He appeals. We affirm.

This is defendant's second trial. His first conviction was reversed in *State v. Randolph*, 698 S.W.2d 535 (Mo.App.1985) because of the admission of prejudicial hearsay evidence. His roommate, Wallace Spivey, was tried and convicted in connection with the same murder, and his conviction was also reversed in *State v. Spivey*, 710 S.W.2d 295 (Mo.App.1986) because of the admission of similar hearsay evidence.

The pertinent facts may be simply stated. Defendant, Spivey, and the victim, Greg Eisenberg, were all prelingually deaf and lived in the Boulevard Apartments in the City of St. Louis. Dottie Wilcox, a psychotherapist for the deaf, worked with the three men and saw them on a regular basis. Wilcox testified that when she met with the victim on August 4, 1981, he appeared "disgruntled with what he saw as wrong actions on the part of Ronnie [defendant]." Wilcox confronted defendant later that week and told him that she was very concerned that his recent actions would "cause serious consequences for him." Defendant said that "Greg was gossiping about him to other deaf people and that Greg had to stop doing that." Defendant communicated this information to Wilcox with strong, angry gestures.[1]

On August 22, the victim showed Wilcox a red knapsack and a blue backpack he had purchased, and on August 24, Wilcox saw the victim wearing his watch when she drove him to the "State Hospital." Wilcox was supposed to give the victim a ride on August 25, however, when she arrived to pick him up he did not appear to be in his apartment and Wilcox left a note. When she saw the note on the victim's door later that afternoon, she asked a maintenance man to check on the situation. Apparently

Henry Robertson, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

---

1. Defendant, being prelingually deaf, communicated by sign language rather than spoken English.

the maintenance man found nothing amiss. When Wilcox saw defendant that same day she asked if he had seen the victim. Defendant stated that he had not seen the victim since Sunday, August 24. Wilcox noticed the victim's knapsacks and his watch in defendant's apartment. Defendant explained that he "had purchased the knapsacks and a watch from Greg and that he believed Greg had gone off camping somewhere, possibly the Yukon."

On Sunday, August 30, a security guard at the Boulevard Apartments noticed that a security alarm in the victim's apartment had been activated. When he investigated, he immediately smelled a decomposed body. The guard found the victim's body in a bathtub filled with water; the victim's left leg was bent slightly up and his head was submerged in the water. When Wilcox learned of Greg's death, she told the police what she had observed about the victim, defendant, and Spivey during the preceding weeks.

The police went to defendant's apartment to investigate, were admitted by defendant, and noticed the knapsacks Wilcox had described. Subsequently, defendant and Spivey went to police headquarters where they were separately interviewed and made statements through an interpreter. Defendant initially stated that he and Spivey had purchased the knapsacks and watch; however, when the police informed defendant that he was under arrest, defendant became very agitated and stated that he would now say what happened. According to defendant, Spivey said that he wanted to kill Greg because Greg was lying to other deaf people about him. Defendant said that Spivey hit Greg with a kitchen knife which broke, that the three men started struggling, and that he held the victim's hands while Spivey put a rope around Greg's neck. After the victim appeared to be dead, Spivey placed the rope in the trash and defendant and Spivey placed the victim in the bathtub, which they filled with water. The autopsy revealed that the victim died either from strangulation or drowning.

We first address defendant's contention that the trial court erred in admitting Wilcox's testimony that the victim was "disgruntled with what he saw as wrong actions on the part of [defendant]." Defendant argues that this was the same type of hearsay evidence which was erroneously admitted in his first trial. The state contends that the challenged testimony was not hearsay because it was not offered to prove the truth of the victim's statement.

■ The state argued at trial that the motive for the crime was to prevent the victim from "gossiping" about the defendant and Spivey, and that the robbery was an "afterthought." The state's theory was supported by the defendant's statement that Spivey wanted to kill Greg because Greg had been lying about him. It was further supported by the defendant's angry comment to Wilcox that Greg had to stop gossiping about him, which was made after Wilcox informed defendant about what the victim had told her. We believe the challenged testimony was relevant to the issue of motive whether or not the victim's statements to Wilcox were true, and the testimony helped explain the defendant's comments about "gossiping." In the context the testimony was offered, it was not hearsay.

The challenged testimony in this case differs substantially from that in defendant's previous trial. There a witness named Larry Jackson testified that he had been robbed and placed in a bathtub after passing out at a party and that the victim [Greg] had told him he suspected defendant and Spivey were the perpetrators. Wilcox testified at the first trial that "the victim had said that [defendant] and Spivey robbed Jackson and placed him in a bathtub." Another witness was permitted to testify that the victim had said he feared defendant. *Randolph*, 698 S.W.2d at 539.

The state argued that all of this testimony was admissible to show the victim's state of mind. We rejected that contention, and we note that the victim's state of mind is no more relevant here than it was in defendant's first trial. However, as we have previously discussed, that was not the basis of the admission of Wilcox's testimony in this case. The state also argued in

*Randolph I* that "the *state of mind of the victim* ... is relevant to prove appellant's motive for killing his victim." 698 S.W.2d at 540 (emphasis ours). That argument concerning motive is slightly different from the one advanced on this appeal, which does not depend upon the victim's state of mind. In addressing the state's argument in *Randolph I* we held:

> Even if this theory were tenable, the prejudicial effect of evidence of an incident similar to the actions surrounding the murder of which appellant is accused far outweighs its probative value. To show that decedent was afraid of appellant would not be error in a self-defense case. To testify to similar criminal acts is error.

*Id.* at 541.

It is obvious that this court's main concern in *Randolph I* was the improper admission of specific evidence of prior criminal acts of the defendant. In addition to the testimony already discussed, the trial court in *Randolph I* also erroneously admitted testimony by a witness that she had been raped by defendant and Spivey.

In contrast, there was no specific mention of the prior criminal acts here. In the context in which it was admitted, Wilcox's testimony was not hearsay, and the prejudicial impact of the admission of this relevant evidence was much less severe than the prejudice created by the admission of the testimony in defendant's first trial. Defendant's point is ruled against him.

Defendant also contends that the trial court erred in admitting state's exhibits 2 and 3, photographs of the victim's decomposing body as it appeared near the time of its discovery in the bathtub, and allowing them to be passed to the jury "because their prejudicial impact outweighed any probative value they might have had in that they were inflammatory while shedding no light on any issue in the case, being unable to show identity or cause of death and irrelevant to the only contested issue, the degree of the offense."

The state argues that these photographs were relevant to show that defendant and Spivey positioned the body in the bathtub in such a way that if the victim was not already dead from strangulation he would drown. The pathologist and investigating officer identified the photographs during their testimony, and the pathologist testified that the victim died either through strangulation or drowning. We believe the photographs demonstrating the location of the victim's body were relevant to the issues of deliberation and cause of death. They demonstrated that the victim was positioned in such a way that his head would remain under water, indicating that defendant and Spivey intended to make sure the victim died, and that they caused his death, whether he died from strangulation or drowning. The photographs were not made inadmissible because other evidence may have described what was in them or because the defendant was willing to stipulate to some of the issues.[2] *State v. Evans*, 639 S.W.2d 820,-822 (Mo.1982).

Defendant relies on *State v. Floyd*, 360 S.W.2d 630 (Mo.1962), in which the supreme court reversed a manslaughter conviction because of the admission of a photograph of a victim's decomposed body eleven days after her death. The court said that the photograph was "obscene, offensive ... and repulsive." *Id.* at 633. The defendant in that case specifically admitted the identity of the body shown in the photograph and the body had also been identified by reference to a watch, bracelet, shoes, and dress. The court stated that:

> [P]hotographs of corpses, even of decomposed bodies, are often properly received in evidence.... If the photographs illustrate any of these purposes and also meet the tests of relevancy and probative force their admissibility is said to be within the discretion of the trial court and it is not a completely valid objection that they are gruesome, or are merely cumulative or corroborative of the testimony of the witnesses.

2. Defendant stipulated to the identity of the body, but the state rejected his offer to stipulate to the position of the body at the time of its discovery.

*Id.* at 633. The court held, however, that the photograph in question was "neither needed nor offered for any of the conventional reasons or purposes" and "any relevant probative value it may have is far outweighed by the fact that it is needlessly and manifestly inflammatory...." *Id.*

In contrast to *Floyd*, the photographs in this case were relevant and probative. They were not "manifestly inflammatory," and we cannot say that the trial court abused its discretion in admitting them and allowing them to be passed to the jury. We also note that many of the aspects of the photographs defendant complains about were vividly described by the pathologist during her testimony. It is "difficult to imagine how any such photographs could conceivably have 'inflamed' the minds of the jury beyond the point to which they were otherwise inflamed by the ... evidence...." *State v. Duisen,* 428 S.W.2d 169, 173 (Mo. banc 1967). Defendant's point is without merit.

Defendant also contends that the court erred in denying his request for a mistrial during the prosecutor's argument because of what he contends was a direct reference by the prosecutor to defendant's failure to testify.

During the rebuttal portion of the state's closing argument, the prosecutor discussed the instruction on second degree murder and the following exchange ensued:

MS. VOSSMEYER [prosecutor]: Because right here in black and white it says, third, "that the defendant or Wallace Spivy did not do so", "do so" meaning kill Greg Eisenberg, "in fear suddenly provoked by the unexpected acts or conduct of Greg Eisenberg." What could be more simple? *Did you hear Ronnie Randolph tell you that they went up there and had this little heart to heart discussion with Greg and he got mad?*

MR. KRAUTMAN [defense counsel]: Objection.

MS. VOSSMEYER: Or pulled a knife or punch.

MR. KRAUTMAN: May I state my objection?

THE COURT: Certainly.

MR. KRAUTMAN: May I do it at sidebar, please.

(The following proceedings were had out of the hearing of the jury:)

MR. KRAUTMAN: The comment that a prosecutor—that statement by the prosecutor was a comment on my client's failure to testify, something like "did you hear Ronnie Randolph say this".

MS. VOSSMEYER: Well, Your Honor, he knows very well I'm talking about the confession, I'm—I'll go back and rephrase it.

MR. KRAUTMAN: I don't know.

THE COURT: I'll sustain the objection.

MS. VOSSMEYER: I'll rephrase it.

THE COURT: Okay.

MR. KRAUTMAN: Your Honor, either when we get back to table or now, may I ask of the Court that it also please instruct the jury to disregard.

THE COURT: I'll tell them to disregard.

MR. KRAUTMAN: Your Honor, in addition, if the court is agreeing to instruct the jury to disregard that last statement, may I furthermore ask that the jury— that the Court grant a mistrial?

THE COURT: Be overruled.

MR. KRAUTMAN: Thank you, Your Honor.

It is well established that where a prosecutor makes a direct and certain reference to an accused's failure to testify he commits reversible error. *State v. Arnold,* 628 S.W.2d 665, 668 (Mo.1982). Crucial to the determination of whether the state has made a direct and certain reference to the accused's failure to testify is the use of the words "accused" and "testify" or their equivalent. *Id.*

The prosecutor here did not use the word "testify" and in the context of the entire arguments and the evidence in this case, "tell" was not its equivalent. Here the defendant did "tell" some things about the crime, and his confession constituted the principal evidence regarding the details of how the victim was killed and what occurred just prior to his death.

During the opening portion of the state's argument, the prosecutor stated:

What did you hear from the *mouth of the very man who sits charged here today?* You heard him *tell* the police that he and Wally sat in their apartment fifteen to thirty minutes before going to Greg's apartment and talked about this and decided to kill him. What better proof can we have than from the *mouth of the person committing the crime* about the coolness and the deliberation and premeditation and the forethought about this murder.

Later she said:

Step by step from the *mouth of the man who committed this crime.* "We sat in our apartment fifteen to thirty minutes talking about his, we were angry, Wally was angry at Greg for talking about him and we decided to kill him."

Defense counsel readily admitted defendant's involvement in the crime during closing argument, but said the real issue was whether it was capital murder. In addressing this question he stated:

Ms. Vossmeyer ... said that Ronnie Randolph's statement was that they had agreed to kill Greg Eisenberg and that they had planned the death of Greg Eisenberg and she said that in closing argument today.... Consider the words that the detective read from the stand. There is no evidence, there is no statement that they agreed to do it.

Defense counsel, on numerous occasions, referred to defendant's statement and discussed what defendant had and had not said. In concluding counsel noted:

But don't think that just because we're trying this case Ronnie Randolph is saying I'm not involved in this, I didn't do any of this. That stopped when the concealment stopped. The concealment stopped on September 3rd, 1981 after the lunch break when the police officers advised Mr. Randolph that he was being placed under arrest and then he said he would tell them what happened. The question, "do you want to tell us what happened?" The answer: "Yes, I will tell now."

■ It is clear that most of the final argument of both parties involved a discussion of what was and was not said in the confession. When placed in this context we cannot say that the prosecutor's statement "did you hear Ronnie Randolph tell you ..." was a direct and certain reference to defendant's failure to testify. It was intended to be, and would have been understood as, further discussion about the confession. At most, the comment was an indirect reference to defendant's failure to testify. Any prejudice to defendant was alleviated by the trial court's curative action and the prosecutor's subsequent argument:

MS. VOSSMEYER: Let me rephrase it. That you no where *in Ronnie Randolph's confession* heard him say anything about fear provoked by acts performed by Greg Eisenberg. There was nothing in there about that. No explanation was given to the police when they were questioning him. No heat of passion incident here where they just went up there and then things got out of hand and one thing led to another. Nothing about that.

Not one mention *in Ronnie Randolph's confession* that would lead you to a murder second verdict or a manslaughter verdict. .

*See, State v. Rothaus,* 530 S.W.2d 235 (Mo. banc 1975). Defendant's point is ruled against him.

■ Finally, defendant objects to a statement in the prosecutor's closing argument he contends indicated that Spivey had implicated defendant in the murder. The state's argument need not be quoted here. We believe the prosecutor's statements regarding "finger pointing" referred to defendant's attempt to minimize his role in the crime. The trial court has broad discretion in controlling closing argument, and we cannot say that it abused its discretion here. *State v. Preston,* 673 S.W.2d 1, 6 (Mo. banc 1984).

Judgment affirmed.

SMITH, P.J., and DOWD, J., concur.